**Slip-Op. 03-13**

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: GREGORY W. CARMAN, CHIEF JUDGE

|  |  |
|---|---|
| HYNIX SEMICONDUCTOR, INC.,<br>HYNIX SEMICONDUCTOR<br>AMERICA, INC., | : <br> : <br> : <br> : |
| **Plaintiffs,** | : <br> : |
| v. | : <br> : |
| UNITED STATES, | :       **Court No. 01-00988** <br> : |
| **Defendant,** | : <br> : |
| and | : <br> : |
| MICRON TECHNOLOGY, INC., | : <br> : |
| **Defendant-Intervenor.** | : <br> : |

[Upon consideration of Plaintiffs' Rule 56.2 motion for judgment upon the agency record, Defendant's and Defendant-Intervenor's responses, and Plaintiffs' reply, Plaintiffs' motion is denied. The Department of Commerce's determination in *Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Administrative Review*, 66 Fed. Reg. 52,097 (Oct. 12, 2001) is affirmed in part and remanded in part. Plaintiffs' motion for oral argument is denied.]

Dated: January 31, 2003

*Willkie Farr & Gallagher* (*Carrie L. Owens, James P. Durling, Daniel L. Porter, Robert E. DeFrancesco, Julia K. Eppard*), Washington, D.C., for Plaintiffs.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *Mark L. Josephs*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *Patrick V. Gallagher, Jr.,* Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant.

*Hale & Dorr LLP* (*Gilbert B. Kaplan, Michael D. Esch, Chris R. Revaz*), Washington, D.C., for Defendant-Intervenor.

## OPINION

**CARMAN, Chief Judge:** This matter comes before the Court on motion for judgment upon the agency record filed by Plaintiffs Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. ("Hynix"). Plaintiffs challenge the United States Department of Commerce's ("Commerce") final antidumping determination in the Seventh Administrative Review of certain dynamic random access memory semiconductors ("DRAMs") of one megabit or above from the Republic of Korea for the period of May 1, 1999 to December 31, 1999. *See Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Administrative Review*, 66 Fed. Reg. 52,097 (Oct. 12, 2001) ("*Final Results*"). The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2000).

## BACKGROUND

On May 10, 1993, Commerce published the antidumping duty order on DRAMs from Korea. *See Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea*, 58 Fed. Reg. 27,520 (May 10, 1993). Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on DRAMs from Korea on May 16, 2000. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 65 Fed. Reg. 31,141 (May 16, 2000). Micron Technology, Inc. ("Micron"), the Defendant-Intervenor in this case, requested an administrative review of Plaintiffs (two Korean DRAMs manufacturers)[1] and six Korean

---

[1]     Hyundai Industries Co., Ltd. ("Hyundai") and LG Semicon Co., Ltd ("LG Semicon") were the two manufacturers named by Micron in the administrative review. In 1999, Hyundai acquired and subsequently integrated LG Semicon into its operations. *See Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 30,688, 30,691

resellers of DRAMs for the period of May 1, 1999 to April 30, 2000. Micron also requested a cost of production ("COP") investigation of Plaintiffs pursuant to 19 U.S.C. §1677b(b) for the period of review ("POR"). *See Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 30,688, 30,689 (June 7, 2001) ("*Preliminary Results*"). On May 31, 2000, Plaintiffs responded to Commerce's notice and requested that Commerce review their exports entered into the United States during the stated POR.

Commerce initiated the Seventh Administrative Review of the antidumping order on DRAMs from Korea on July 7, 2000. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part*, 65 Fed. Reg. 41,942 (July 7, 2000). While the Seventh Administrative Review was pending, Commerce published the final results of a separate sunset review of the subject DRAMs from Korea. *See Dynamic Random Access Memory Semiconductors ("DRAMs") of One Megabit and Above From the Republic of Korea; Final Results of Full Sunset Review and Revocation of Order*, 65 Fed. Reg. 59,391 (Oct. 5, 2000) ("*Final Sunset Results*"). Commerce concluded that it would be unlikely that dumping of DRAMs from Korea would continue or resume. *Id.* at 59,391-92. Thus, the antidumping duty order was revoked effective December 31, 1999. *Id.* at 59,392. The revocation of the antidumping duty order shortened the POR of the Seventh Administrative Review to eight

_____

(June 7, 2001) ("*Preliminary Results*"). As a result, Commerce treated Hyundai and LG Semicon as one entity when completing the administrative review for the Preliminary Results. *See id.* at 30,690. During the administrative review, Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America changed their names to Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc., respectively. (Pls.' Complaint at 1; Def.'s Br. at 6 n.3.) For simplicity, this opinion refers to Plaintiffs and their predecessors as "Hynix" or "Plaintiffs."

months, covering May 1, 1999 to December 31, 1999, rather than a full twelve month review period. *See Preliminary Results,* 66 Fed. Reg. at 30,689. DRAMs entering on or after January 1, 2000, were to be liquidated without regard to antidumping duties. *Final Sunset Results,* 65 Fed. Reg. at 59,392.

Commerce published the *Preliminary Results* of the Seventh Administrative Review on June 7, 2001. *See Preliminary Results*, 66 Fed. Reg. 30,688. In the *Preliminary Results,* Commerce calculated the dumping margin by using the sales plus POR-entries approach suggested by Plaintiffs. *Id.* at 30,692. The sales plus POR-entries approach included the constructed export price sales of products completed during the POR and entries of the subject merchandise that entered within the POR with sales that concluded after the POR. *Id.* Using this hybrid approach, Commerce arrived at a 3.01 percent dumping margin. *Id.* at 30,694.

Commerce published the *Final Results*, accompanied by the *Final Decision Memorandum* of the Seventh Administrative Review on October 12, 2001. *See Final Results,* 66 Fed. Reg. 52,097; *Issues and Decision Memorandum for the Administrative Review of Dynamic Random Access Memory Semiconductors from Korea - 5/1/1999 through 12/31/1999; Final Results* (Oct. 5, 2001) (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7) ("*Final Decision Memorandum*").

The *Final Results* included four determinations that Plaintiffs challenge in the instant case. First, Commerce used a different methodology to calculate the dumping margin in the *Final Results* than it had used in the *Preliminary Results* to arrive at a 2.92 percent dumping margin in the *Final Results*. *Final Results,* 66 Fed. Reg. at 52,099; *Final Decision Memorandum* at cmt. 7 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Instead of using the sales plus POR-

entries approach as the basis for calculating the dumping margin, Commerce only used sales completed during the POR. *Id.* Second, Commerce recalculated Plaintiffs' reported research and development ("R&D") costs. *Final Decision Memorandum* at cmts. 2 and 3. Third, Commerce rejected Plaintiffs' accounting adjustments for the average useful lives ("AULs") of Plaintiffs' semiconductor equipment. *Id.* at cmt. 5. Fourth, Commerce rejected Plaintiffs' use of offsets to foreign currency exchange losses for the revaluation of Plaintiffs' fixed assets. *Id.* at cmt. 1.

Plaintiffs commenced this action on December 10, 2001, to challenge the *Final Results*.

### STANDARD OF REVIEW

The Court will sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997). "The specific determination we make is whether the evidence and reasonable inferences from the record support" Commerce's findings. *Daewoo Elecs. v. Int'l Union*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

In determining whether Commerce's interpretation and application of the dumping duty statute is in accordance with law, the Court must consider whether "Congress has directly spoken to the precise question at issue," and if not, whether the agency's interpretation of the statute is reasonable. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). "[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1570 (Fed. Cir. 1994).

Additionally, the Court recognizes that "Commerce's special expertise in administrating the anti-dumping law entitles its decisions to deference from the courts." *Ta Chen Stainless Steel Pipe, Inc. v. United States,* 298 F.3d 1330, 1335 (Fed. Cir. 2002)*.*

**DISCUSSION**

**I.** **Commerce's Decision to Calculate the Dumping Margin Based Solely on Sales Completed During the Period of Review is Supported by Substantial Evidence or Otherwise in Accordance with Law.**

A. *Plaintiffs' Contentions*

Plaintiffs believe that Commerce erred in calculating the "ultimate antidumping duty liability" because Commerce only used constructed export price sales completed during the POR to arrive at the dumping duty published in the *Final Results*. (Plaintiffs' Motion for Judgment Upon the Agency Record ("Pls.' Br.") at 6.) Plaintiffs contend that Commerce's approach resulted in an inaccurate and incomplete "universe of U.S. sales" upon which Commerce based the dumping calculation. (*Id.*) According to Plaintiffs, the basis for the dumping calculation was incomplete because Commerce did not include sales of the subject merchandise that entered the United States during the POR, but which were not shipped to the customer prior to the end of the POR. (*Id.* at 7.) Thus, Plaintiffs explain, these entries did not have a "sale date" during the POR and were not used by Commerce in determining the final dumping margin. (*Id.*) Plaintiffs argue that the dumping margin calculation was inaccurate because all POR-entries of the subject merchandise were assessed a duty, but not all POR-entries were included in calculating that duty. (*Id.* at 13-14.)

Plaintiffs submit that Commerce should have calculated the dumping margin using Plaintiffs' suggested sales plus POR-entries approach. (*Id.* at 10-12.) Plaintiffs' suggested

approach is not a "pure entry-based approach" seen in previous administrative reviews. (Reply Brief of Plaintiffs Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. ("Pls.' Reply Br.") at 8.) Rather, Plaintiffs' sales plus POR-entries approach uses "all sales during the POR plus sales that occurred after the POR but were entered before termination of the [antidumping] order" to calculate the dumping margin. (Pls.' Br. at 14.)

Plaintiffs note that Commerce used their suggested sales plus POR-entries approach to determine the dumping margin in the *Preliminary Results.* (*Id*. at 7 n.15.) However, Commerce changed to a sales-based approach in the *Final Results.* (*Id.* at 7.) Plaintiffs maintain that this change "cannot be sustained." (*Id.*)

Plaintiffs argue that Commerce's decision to rely on a sales-based approach rather than Plaintiffs' sales plus POR-entries approach in determining the dumping margin is contrary to the statutory intent of determining accurate antidumping duty liability. (*Id*. at 8.) Plaintiffs advance that Commerce failed to take into account the "unique circumstances" of this case: (1) the POR is truncated to eight months, rather than the typical twelve months; and (2) this is the last administrative review of the subject merchandise. (*Id.* at 12-15.) Plaintiffs contend that because of these unique circumstances, the opportunity to correct inaccuracies in a subsequent review is no longer available. (*Id.* at 12; Pls.' Reply Br. at 6-7.) Therefore, Plaintiffs assert, the facts warrant the use of the sales plus POR-entries approach.

B. *Defendant's Contentions*

Defendant maintains that Commerce's methodology used in the *Final Results* to calculate the dumping duty is in accordance with law. (Defendant's Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Def.'s Br.") at 8.) Defendant contends that 19 U.S.C.

§1675(a)(2), the statute addressing antidumping duty determinations, does not prescribe the methodology that Commerce must employ in determining the dumping duty. (*Id.*) Defendant asserts that the Court should defer to Commerce's calculation methodology, if it is reasonable. (*Id.* at 9.) According to Defendant, the reasonableness of the decision to use a sales-based approach to calculate the dumping margin is supported by Commerce's explanation in the *Final Results* and the fact that this Court has upheld this methodology in other administrative reviews. (Def.'s Br. at 9 (citing *Ad Hoc Comm. of S. Cal. Producers of Gray Portland Cement v. United States*, 914 F. Supp. 535 (Ct. Int'l Trade 1995))); *Final Decision Memorandum* at 22-23 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7).

Defendant argues that Commerce's use of a sales-based approach in this case is in accordance with Commerce's normal practice of basing the dumping margin calculation on sales during the POR, especially in order to ensure consistency with prior reviews and to take into account the difficulties of accurately connecting entries to sales. (Def.'s Br. at 9-10.) Defendant cites the rationale outlined in the promulgating regulations pursuant to the Uruguay Round Agreements Act to support Commerce choice of methodology in the present case. (*Id.* (citing *Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296, 27,314 (May 19, 1997)).) Defendant maintains that Commerce's decision to base the dumping margin calculation on sales of the subject merchandise during this POR was reasonable because that approach has been used in all six previous administrative reviews involving the subject merchandise and Plaintiffs are admittedly unable to tie all POR entries to post-POR sales. (*Id.* at 11-13.)

Defendant refutes Plaintiffs' contention that Commerce should have exercised its discretion to use post-POR sales of subject merchandise that entered during the POR. (*Id.* at 12.)

Defendant concedes that there is no "rule" that requires a sales-based approach be used in calculating all dumping margins. (*Id.* at 12-13.) However, Defendant points to the preamble of Commerce's regulations which states that Commerce will use either entries or sales for calculating a dumping margin in administrative reviews and that "consistency across administrative reviews is the essential factor when Commerce considers whether to use entries instead of sales for its dumping analysis." (*Id.* at 12.) Defendant continues that nowhere in Commerce's regulations or in the agency's practice has a hybrid sales plus POR-entries approach been used to calculate dumping duties. (*Id.*) Contrary to Plaintiffs' claim of increased accuracy, Defendant asserts that it is not clear how the use of a hybrid approach in this case would yield more accurate results, especially given the fact that Plaintiffs could not tie all POR-entries to post-POR sales. (*Id.* at 14.) Defendant argues that utilizing the hybrid sales plus POR-entries approach proposed by Plaintiffs will lead to distortions in the dumping calculation because such an approach was not used in the prior administrative reviews involving Plaintiffs. (*Id.* at 13.)

To further support its position, Defendant states that this Court has upheld Commerce's use of a sales-based methodology even in cases where the information necessary to use an entry-based methodology was available. (*Id.* at 14 (citing *Gray Portland Cement*, 914 F. Supp. at 544 n.7).) Therefore, Defendant asserts, Commerce's use of a sales-based approach for the *Final Results* was reasonable and in accordance with Commerce's regulations, Commerce's prior practice, and the antidumping statute. (*Id.* at 14-15.)

C.     *Defendant-Intervenor's Contentions*

Because the Court finds Defendant-Intervenor's ("Micron") arguments on this issue are substantially similar to those presented by Defendant, the Court will not recount them in this

opinion, although they have been duly considered.

D.      *Analysis*

For the reasons set forth below, the Court holds that Commerce's decision to use a sales-based approach in the *Final Results* to calculate duty margins is supported by substantial evidence or is otherwise in accordance with law pursuant to 19 U.S.C. § 1516a(b)(1)(B).

Plaintiffs are incorrect in their assertion that Commerce's change of calculation methodology from a sales plus POR-entries approach in the *Preliminary Results* to the sales-based approach in the *Final Results* cannot be sustained.  This Court notes that Commerce adopted Plaintiffs' calculation methodology in the *Preliminary Results* without explanation.  *See Preliminary Results,* 66 Fed. Reg. at 30,689, 30,692.  However, in the *Final Results,* Commerce explained the rationale behind returning to the sales-based approach.  *See Final Decision Memorandum* at 22-23 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7).   Generally, "an agency must either conform itself to its prior decisions or explain the reasons for its departure.'" *Hussey Copper, Ltd. v. United States,* 834 F. Supp. 413, 418 (Ct. Int'l Trade 1993) (quoting *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988)).  The Court will reject an agency's determination to depart from past practice if there is an insufficient explanation. *Am. Silicon Techs. v. United States*, 19 F. Supp. 2d 1121, 1123 (Ct. Int'l Trade 1998). Commerce's practice during the prior administrative reviews of the subject merchandise has been to base the dumping margin calculations on sales made during a given POR.  (Def.'s Br. at 11.) Commerce departed from that practice in the *Preliminary Results* of this administrative review, but returned to that method for the *Final Results.*  As detailed below, the Court finds that Commerce supplied a reasonable explanation to support its decision to apply the sales-based

approach in this final administrative review.

Commerce's application of 19 U.S.C. § 1675(a)(2)(A)(ii) in this case is supported by substantial evidence and is otherwise in accordance with law because the statute does not limit Commerce to using only entries to calculate the dumping margin. Subsection 1675(a)(2)(A)(ii) states that Commerce "shall determine the dumping margin for each . . . entry," and the dumping duty determinations shall be the basis of assessment of duties on the entries of merchandise during the POR. However, this Court has held that "Congress could not have intended to limit Commerce's margin calculations solely to entries." *Am. Silicon Techs. v. United States*, 23 Ct. Int'l Trade 237, Slip Op. 99-34 at 7 (Apr. 9, 1999). Because the statute does not specify the basis upon which Commerce must calculate the dumping margin, "the Court must defer to Commerce's interpretation of the statute as long as the interpretation is reasonable." *Helmerich & Payne, Inc. v. United States*, 24 F. Supp. 2d 304, 309-10 (Ct. Int'l Trade 1998) (citing *Koyo Seiko Co.*, 36 F.3d at 1573).

Commerce's regulations accord it the flexibility to rely upon sales occurring during the POR to make margin calculations where appropriate. Specifically, 19 C.F.R. § 351.213 allows Commerce to base its margin calculation on "entries, exports, or sales." 19 C.F.R. § 351.213(e)(1) (1997). Although Commerce applied Plaintiffs' suggested sales plus POR-entries approach in the *Preliminary Results,* Commerce returned to the sales-based method used throughout the prior administrative reviews in this case for the *Final Results* in order to be consistent.

The importance of consistency across reviews can be inferred from the rationale outlined in the promulgating regulations pursuant to the Uruguay Round Agreements Act and supports

Commerce's choice of margin calculation methodology in the present case. *See Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. at 27,314. Although some limited circumstances may exist to afford the use of an entry-based methodology[2], in this case, Commerce declined to exercise its discretion to include post-POR sales in the administrative review because there was no compelling evidence to cause Commerce to deviate from using completed sales as it had done in the prior administrative reviews. *Final Decision Memorandum* at 20-23 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Moreover, nothing in Commerce's regulations supports the use of a hybrid sales plus POR-entries approach for calculating dumping margins.

This Court has upheld Commerce's decision to use sales during the POR rather than entries during the POR for the purposes of calculating antidumping margins. *See Gray Portland Cement*, 914 F. Supp. 535, 544. Commerce's approach is not made unreasonable by the fact that POR-sales used to calculate the dumping margin are not necessarily tied to the POR-entries that will be assessed that dumping margin or by the fact that Plaintiffs could provide Commerce with the information to calculate the dumping margin based on entries during the POR. *See id.*; *see also NSK Ltd. v. United States,* 825 F. Supp. 315, 320 (Ct. Int'l Trade 1993). This Court has acknowledged that the use of sales rather than entries in calculating the dumping margin "may result in the . . . failure to consider entries made, but not sold, during the period of review." *Gray Portland Cement*, 914 F. Supp. at 544. Nevertheless, "such consequences are permissible so long as dumping duties are assessed only upon entries made during the period of review." *Id.* at 544-45.

---

[2]         *See, e.g., Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,314 ("Where a respondent *can* tie its entries to its sales, we potentially can trace each entry of subject merchandise made during a review period to the particular sale or sales of that same merchandise to unaffiliated customers, and we conduct the review on that basis.").

Plaintiffs do not demonstrate that the circumstances of the present case are so unique that Commerce was unreasonable in its decision to use the sales-based approach that had been used in the previous six administrative reviews.

For the foregoing reasons, the Court holds that Commerce's decision to use POR-sales to calculate the dumping margin for the Seventh Administrative Review is supported by substantial evidence and is otherwise in accordance with law.

II.     **Commerce's Decision to Reject Plaintiffs' Method of Accounting for Research and Development Expenses is Remanded.**

Plaintiffs challenge two aspects of Commerce's treatment of Plaintiffs' research and development ("R&D") costs used in constructing the cost of production ("COP") for the subject merchandise based on Defendant-Intervenor's request for the COP calculation under 19 U.S.C. § 1677b(f)(1)(A). *See Preliminary Results*, 66 Fed. Reg. at 30,689. Plaintiffs question: (1) whether Commerce properly rejected their amortized R&D costs; and (2) the appropriateness of Commerce's reallocation of total semiconductor R&D costs over all semiconductor production based on its application of its cross-fertilization of R&D theory. (Pls.' Br. at 18, 26.) These two issues are addressed separately in the following discussion.

For the reasons stated below, this Court finds that Commerce's determination regarding Plaintiffs' reported amortized R&D costs and the appropriateness of Commerce's reallocation of total R&D costs over all semiconductor production by its application of its cross-fertilization theory are unsupported by substantial evidence, or otherwise not in accordance with law. Accordingly, these issues are remanded to Commerce for further consideration and explanation.

1.       Commerce's Rejection of Plaintiffs' Reported R&D Costs

A.       *Plaintiffs' Contentions*

Plaintiffs provided Commerce with amortized R&D costs for 1999 to be used as one of the components in calculating the COP for the subject merchandise. (*Id.* at 17; *see also* "Memorandum to File From Paige Rivas Regarding Verification of the Response of Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America, for the 1999 Administrative Review of Dynamic Random Access Memory Semiconductors of One Megabit and Above from Korea" (May 31, 2001) (Pls.' Conf. App. Ex. 3) ("Sales Verification Report"). ) Commerce verified the reported R&D costs, noting that Plaintiffs maintained costs by project, and found no discrepancies between the reported costs and Plaintiffs' financial statements. (Sales Verification Report at 14-15 (Pls.' Conf. App. Ex. 3).) In the *Final Results*, Commerce rejected Plaintiffs' amortized R&D for two reasons: (1) alleged distortions to the COP resulting from changes in Plaintiffs' accounting practices during the Fifth Administrative Review; and (2) Plaintiffs' accounting practice of deferring certain development expenses. *See Final Decision Memorandum* at 8-11 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Plaintiffs argue that Commerce's decision to reject the reported amortized R&D costs in the *Final Results* is without merit and is not supported by substantial evidence on the record. (Pls.' Br. at 18.)

Plaintiffs argue that Commerce did not apply 19 U.S.C. § 1677b(f)(1)(A) properly. (*Id.* at 19.) According to Plaintiffs, by rejecting the amortized R&D costs, Commerce undermined the objective of Article 2.2.1.1 of the Agreement on Implementation of Article VI of General Agreement on Tariffs and Trade 1994, which was incorporated by 19 U.S.C. § 1677b(f)(1)(A). (*Id.*) Plaintiffs interpret Article 2.2.1.1 as intending to prevent the use of arbitrary costs figures by

WTO members when calculating the cost of production. (*Id.*) Plaintiffs note that Commerce has historically accepted a respondent's reported R&D costs where those costs were consistent with the respondent's home country's Generally Accepted Accounting Principles ("GAAP") and the method of accounting used by the respondent did not distort the COP. (*Id.* (citations omitted).) Plaintiffs contend that in applying § 1677b(f)(1)(A), Commerce "may only deviate from a company's GAAP-consistent data where the reported costs do not 'reasonably reflect' the actual costs of producing the subject merchandise during the period of review." (*Id.* at 18.) Plaintiffs assert that their method of accounting is consistent with Korean GAAP and the R&D costs submitted to Commerce reasonably reflected the actual cost of production of the subject merchandise during this POR. (*Id.* at 19-21.)

Plaintiffs deny that distortions arose such that the reported R&D costs did not accurately reflect the COP simply because Plaintiffs changed R&D accounting practices in the past. (*Id.* at 20-21.) First, Plaintiffs contend that Commerce overstates the frequency with which they have changed R&D accounting methods. (*Id.* at 21.) Plaintiffs note that prior to the initial investigation in this case, while operating as Hyundai Industries Co., Ltd. ("Hyundai"), they historically amortized R&D costs. (*Id.*) In 1996, Hyundai switched to expensing R&D costs and then in 1997, returned to amortization. (*Id.*) Plaintiffs explain that LG Semicon, the company that Plaintiffs acquired in 1999, expensed its R&D costs from 1993 to 1997. (*Id.* at 21 n.61.) Plaintiffs state that their business decision in 1997 to return to their previously-used accounting method of amortizing R&D costs does not establish a practice of "continuously" changing accounting methodologies from one review to the next. (*Id.* at 22.)

Plaintiffs contend that a change in their R&D accounting method prior to and during the

Fifth Administrative Review does not continue to have distortive effects on the COP in this review. (*Id.*) Plaintiffs challenge the validity of Commerce's assertion that changing accounting methods fails to capture all R&D costs because the new method does not include R&D costs that would have otherwise been amortized in prior years. (*Id.*) Plaintiffs maintain that Commerce overlooked the fact that "by expensing R&D costs in 1996 . . . all the amounts that would have been amortized [in 1996] were taken into account in the prior year's costs, in previous administrative reviews." (*Id.*) Plaintiffs assert that the information provided to Commerce demonstrates that R&D costs incurred in the subsequent years are then carried forward over the life of the R&D asset. (*Id.* at 22.) Plaintiffs claim that they provided Commerce with evidence to support this contention in their response to Commerce's request for information during the administrative review. (*Id.* (citing "Response of Hyundai Electronics Indus. Co., Ltd. and Hyundai Electronics America to the Department's Supplemental Request for Information," vol. 2 at DS-2 (Dec. 28, 2000) (BPI Doc. No. 4) (Pub. Doc. No. 31) (Pls.' Conf. App. Ex. 4)).)

Plaintiffs note that Commerce has previously accepted amortized R&D costs for other products and even rejected a respondent's attempt to expense current R&D costs where these costs were amortized in the respondent's financial statement. (*Id.* at 23-24 (citing *Final Determination of Sales at Less Than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea*, 56 Fed. Reg. 16,305, 16,312 (Apr. 22, 1991); *Final Determination of Sales at Less Than Fair Value: Certain Welded Stainless Steel Pipe From the Republic of Korea,* 57 Fed. Reg. 53,693 (Nov. 12, 1992)).) Plaintiffs acknowledge that Commerce has, however, rejected amortized R&D costs in favor of expensing R&D costs in administrative reviews involving DRAMs and SRAMs from Korea and Taiwan. (*Id.* at 24 (citing

*Final Decision Memorandum* at 10-11 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).)

Nevertheless, Plaintiffs assert that the use of amortized R&D costs for COP calculations in

administrative reviews of other products is equally appropriate for the subject DRAMs in this

administrative review. (*Id.* at 25.) Plaintiffs cite to *Micron v. United States*, where "this Court

expressly recognized in a semiconductor context that amortizing R&D costs 'reasonably reflects'

the cost of production." (*Id.* (citing *Micron Tech., Inc. v. United States,* 893 F. Supp. 21, 28

(1995) ("*Micron I*")).)

Commerce also rejected Plaintiffs' accounting practice of indefinitely deferring certain

R&D costs for merchandise not produced in that year because, according to Commerce, the

practice did not reasonably reflect the COP of the subject merchandise. *Final Decision*

*Memorandum* at 9 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Plaintiffs claim that the

indefinite deferral of certain R&D costs until the project is commercialized is permissible because

such deferral is allowed under Korean GAAP and International Accounting Standard No. 9.[3] (*Id.*

at 25-26.) Further, Plaintiffs argue that indefinite deferral of R&D costs more accurately reflects

the actual costs of producing DRAMs because such deferral matches R&D costs with the period

---

[3]     International Accounting Standards are statements by the International Accounting
Standards Board intended to provide "a single set of high-quality, global accounting standards
that require transparent and comparable information in general purpose financial statements." 2
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, AICPA PROFESSIONAL STANDARDS
11,051 (1996) (updated June 2002). The International Accounting Standards Board is an
independent accounting standards setter based in London, United Kingdom. *Id.* The United
States is one of seven national accounting standards setters. The International Accounting
Standards Board, *Frequently Asked Questions,* http://www.iasc.org.uk/cmt/0001.asp (last visited
Jan. 23, 2003).
        International Accounting Standard No. 9 was superseded by International Accounting
Standard No. 38: Intangible Assets, which became effective for annual financial statements
covering periods beginning on or after July 1, 1999. 2 AMERICAN INSTITUTE OF CERTIFIED
PUBLIC ACCOUNTANTS, AICPA PROFESSIONAL STANDARDS 11,899 (1996) (updated Sept. 1998).

of time in which that research and development generates revenue. (*Id.* at 26.)

Plaintiffs rely on International Accounting Standard No. 9 to support their position that deferring R&D costs does not distort the COP. (*Id.* at 23, 25-26.) Plaintiffs argue that "[International Accounting Standard No.] 9 states that deferral of R&D costs is required in order to match the expenses with the benefits derived from the R&D expenditures, and therefore '[a]mortization commences when the product or process is available for sale or use.'" (*Id.* at 23 (quoting International Accounting Standard No. 9 at para. 21).) Plaintiffs assert that there is no distortion of COP because deferring R&D costs until benefits are realized more accurately matches future revenue to expenses. (*Id.* at 24.) Plaintiffs add that expensing costs when incurred creates the very distortions that Commerce is concerned about by "artificially depress[ing] profits prior to the introduction of a new product and artificially inflat[ing] profits in production years." (*Id.*) Thus, Plaintiffs argue, Commerce is distorting R&D costs for this POR by not permitting Plaintiffs to defer these costs. (*Id.* at 22-23.)

B.      *Defendant's Contentions*

Defendant argues that Plaintiffs' use of different accounting methods and their practice of indefinitely deferring certain R&D costs created distortions in their reported R&D costs for the POR. (Def.'s Br. at 15.) Therefore, Defendant asserts that Commerce properly rejected Plaintiffs' reported R&D costs and properly substituted R&D costs actually incurred during the POR for the COP calculation. (*Id.*)

According to Defendant, the principle reason that Commerce rejected Plaintiffs' amortized R&D costs is the numerous changes in accounting methods that Plaintiffs employed during the administrative reviews of the subject merchandise. (*Id.*) Defendant contends that Plaintiffs' use

of different accounting methods from year to year distorted their reported R&D costs for dumping purposes. (*Id.* at 15-20.) Defendant contends that Plaintiffs' reliance on the fact that Plaintiffs' accounting practices are in accordance with prior rulings of this Court and the Korean GAAP is misplaced. (*Id.* at 15.) Defendant states that § 1677b(f)(1)(A) directs Commerce to rely on the records of the exporter or the producer of the subject merchandise "if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country where appropriate) and reasonably reflect the costs associated with production and sale of the merchandise." (*Id.* at 15-16 (citing 19 U.S.C. § 1677b(f)(1)(A)).) Defendant also cites to the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), which emphasizes that "[t]he exporter or producer will be expected to demonstrate that it has historically utilized such allocations, particularly with regard to the establishment of appropriate amortization and depreciation periods and allowances for capital expenditures and other development costs." (*Id.* at 16 (citing SAA, Pub. L. Doc. 103-465 at 834 (1994), *reprinted in* 1994 U.S.C.C.A. 4040, 4172).)

Defendant concedes that Commerce has accepted a respondent's accounting methodology where that methodology is in accordance with the home country's GAAP. (*Id.*) Defendant also concedes that Plaintiffs' method of amortizing and deferring R&D costs is permissible under Korean GAAP, as is their previous method of expensing all R&D costs in the year incurred. (*Id.* (citing *Final Decision Memorandum* at 8 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).) However, as indicated in the *Final Decision Memorandum,* Defendant contends that Commerce found Plaintiffs' use of different accounting methods created distortions in the dumping calculations. (*Id.* at 16-20 (citing *Final Decision Memorandum* at 8-9 (Pub. Doc. No. 72) (Def.'s

Pub. App. Ex. 7)).)   Because of these distortions, Defendant asserts that the R&D costs reported

by Plaintiffs do not reasonably reflect the cost of producing the subject merchandise.   (*Id.* (citing

*Final Decision Memorandum* at 8-11 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).)

Defendant disagrees with Plaintiffs' argument that Commerce's treatment of R&D costs is

contrary to the Court's decision in *Micron I.*  (*Id.* at 18.)  Defendant argues that *Micron I* is not on

point.  (*Id.*)  According to Defendant, *Micron I* dealt with Commerce recalculating R&D costs

despite the fact that the accounting methods were consistent with Korean GAAP.  (*Id.*)  Here,

Commerce rejected the reported amortized R&D costs because Plaintiffs changed accounting

methods between review periods, not because of the accounting method selected by Plaintiffs.

(*Id.*)

Defendant argues that Plaintiffs' "business decision" justification for changing accounting

methods is irrelevant.  (*Id.* at 19.)  Defendant contends that the reasons behind the changes are not

at issue; rather, the significance of the changes in accounting is that they have the effect of

"distort[ing] the magnitude of [Plaintiffs'] R&D expenses, and thus . . . artificially lower[ing]

Plaintiffs] costs [of production]."  (*Id.*)  Defendant cites to the second *Micron v. United States*

case to support the proposition that a change from expensing R&D costs to amortizing R&D costs

frustrates "the object of the cost of production exercise . . . to capture . . . those expenses that

reasonably and accurately reflect the respondent's actual production costs for a period of review."

(*Id.* (citing *Micron Tech., Inc. v. United States,* 23 Ct. Int'l Trade 380, 382 (1999) (*"Micron*

*II"*)).)

Defendant finds Plaintiffs' accounting practice of indefinitely deferring certain R&D costs

to be problematic.  (*Id.*)  Defendant notes that prior to the Fifth Administrative Review, Plaintiffs

recognized R&D costs in the year incurred; however, they now defer these R&D costs indefinitely. (*Id.* at 20.) Defendant argues that this change is inconsistent with previous administrative reviews and is contrary to the accounting principle of conservativism: "where an expense is recognized when incurred if the probability of associated revenue is remote or uncertain." (*Id.* (quoting *Final Decision Memorandum* at 8 (Pub. Doc. No. 72) (Def.'s Pub. Pub. App. Ex. 7)).) Defendant contends that substantial evidence demonstrates that Plaintiffs' reported amortized R&D costs and their accounting practice of indefinitely deferring certain R&D costs do not accurately reflect the COP of the subject merchandise; therefore, Commerce properly rejected Plaintiffs' reported R&D costs and properly used actual R&D costs in the COP calculations. (*Id.* at 19-20.)

    C.    *Defendant-Intervenor's Contentions*

The Court finds that the majority of Defendant-Intervenor's arguments on this issue are substantially similar to those presented by the Defendant. Therefore, the Court will not recount the arguments in their entirety, although they have been duly considered. The Court will, nevertheless, note some of the arguments that were addressed in greater detail by Micron.

Micron provides a more detailed time line of Plaintiffs' changes in accounting methods. Micron notes that Plaintiffs, while operating as Hyundai and LG Semicon, amortized R&D costs in 1992, during the initial antidumping investigation. (Brief of Defendant-Intervenor Micron Technology, Inc. in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.-Int.'s Br.") at 7 (referencing "Issues and Decision Memorandum from Holly A. Kuga, Acting Deputy Assistant Secretary, Import Administration, to Troy H. Cribb, Assistant Secretary for Import Administration," (Nov. 3, 2000) adopted by *Dynamic Random Access*

*Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Duty Administrative Review,* 65 Fed. Reg. 68,976, 68,978 (Nov. 15, 2000)).) In 1993 and 1996, LG Semicon and Hyundai, respectively, changed accounting methodologies and began expensing all R&D costs in the year incurred. (*Id.* at 7-8.) In 1997, Hyundai and LG Semicon returned to amortizing R&D costs. (*Id.* at 8.)

Micron explains that in switching "from amortizing to expensing of R&D, the companies included in their transition year R&D costs all of the accumulated R&D expenses that had been incurred in prior years but which had been capitalized and were scheduled to be amortized in subsequent periods. This transition resulted in the companies recording unusually high R&D costs in the transition year (all R&D incurred in that year plus previously unamortized R&D from prior years)." (*Id.* at 7-8.) Micron observes that in the First Administrative Review, this Court agreed with LG Semicon's argument that the transition from amortizing to expensing "caused the R&D expenses as recorded in LG [Semicon]'s accounts for 1993 to be distortive for antidumping purposes." (*Id.* (discussing *Micron II*, 23 Ct. Int'l Trade at 380-81).)

Micron disagrees with Plaintiffs' assertion that Commerce's decision to reject Plaintiffs' amortized R&D costs is contrary to Commerce's practice of accepting a respondent's reported R&D costs. (*Id.* at 31.) Micron asserts that Commerce's decision to reject amortized R&D costs is "in accord with its established practice" in semiconductor cases. (*Id.* at 31-32.[4]) Micron notes

---

[4]     Micron cites to the following administrative reviews: *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed Reg. 8,909 (Feb. 23, 1998) ("*SRAMs from Taiwan*"); *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From the Republic of Korea*, 63 Fed Reg. 8,934 (Feb. 23, 1998) ("*SRAMs from Korea*"); *Notice of Final Determination of Sales at Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above ("DRAMs") From Taiwan*, 64 Fed. Reg. 56,308

that in the *Final Decision Memorandum*, Commerce observed that "for at least the last six years and throughout the course of this proceeding, [Commerce] has constantly required that respondents recognize R&D expenses in the year incurred" even though amortization of R&D expenses has been permitted in administrative reviews of other products. (Id. at 32 (citing *Final Decision Memorandum* at 10 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).) Micron also points to an administrative review in which a respondent changed accounting practices during the course of the administrative review and offered arguments similar to those offered by the Plaintiffs in this case. (*Id.* at 32-33 (citing *Structural Steel Beams from Korea*, Issues and Decision Memorandum (July 5, 2000)).) Micron notes that in that administrative review, Commerce similarly rejected respondent's reported amortized R&D costs and recognized actual R&D costs for the given year. (*Id.* at 33.)

Micron argues that Commerce properly rejected Plaintiffs' practice of indefinitely deferring R&D costs for certain projects as distorting the COP of the subject merchandise. (*Id.* at 29-30.) Micron offers additional clarification of International Accounting Standard No. 9. (*Id.* at 30.) Micron interprets International Accounting Standard No. 9 to distinguish between research costs and development costs for accounting purposes. (*Id.*) "[C]osts identified as research [must] be charged to current expenses, and costs identified as development are to be capitalized, but only if specified criteria are met, including that the 'costs attributable to the product can be separately identified and measured reliably.'" (*Id.* at 30-31 (citing THE IASC-U.S. COMPARISON PROJECT: A REPORT ON THE SIMILARITIES AND DIFFERENCES BETWEEN IASC STANDARDS AND U.S. GAAP 174 (Financial Accounting Standards Bd., 1996) (emphasis omitted).) Micron explains that if the

_____

(Oct. 19, 1999) ("*DRAMs from Taiwan*").

criteria for costs identified as "development" are not met, International Accounting Standard

No. 9 requires that those costs be expensed in the year incurred. (*Id.* at 31.) Micron notes that

Plaintiffs did not demonstrate that their R&D costs in 1999 could be tied to future revenues with

any reasonable degree of certainty. (*Id.*) Thus, according to Micron, even under International

Accounting Standard No. 9, Commerce properly rejected Plaintiffs' practice of indefinite deferral

of certain R&D costs. (*Id.*)

     D.    *Analysis*

     This Court holds that Commerce's rejection of Plaintiffs' amortized R&D costs and

Commerce's rejection of Plaintiffs' indefinite deferral of certain R&D expenses are unsupported

by substantial evidence and are otherwise not in accordance with law. The following analysis will

first address Commerce's treatment of Plaintiffs' amortized R&D costs and will then discuss

Commerce's refusal to allow Plaintiffs' deferral of certain R&D expenses.

     First, this Court finds that Commerce's decision to expense R&D costs in the COP

calculation is not supported by substantial evidence or otherwise in accordance with law.

Accordingly, this issue is remanded to Commerce to reconsider and further explain why the use of

Plaintiffs' amortized R&D costs would not reasonably and accurately reflect Plaintiffs' actual

R&D expenses for this POR, and to identify what distortions, if any, would arise in the COP

calculation if amortized R&D costs were used.

     This Court finds that Commerce faces similar problems in this case as it did in *Micron I.*

In *Micron I*, the Court held that Commerce failed to provide an adequate explanation for its

decision to reject the respondent's amortized R&D costs that were consistent with Korean GAAP.

*Micron I*, 893 F. Supp. at 28. The Court, in *Micron I*, noted the established principle that

"Commerce will apply the GAAP of the home country if it is satisfied that those principles reasonably reflect all of the costs associated with production of the subject merchandise." *Id.* (citing *Camargo Correa Metais, S.A. v. United States,* 17 CIT ___, Slip. Op. 93-163 at 4 (Aug. 13, 1993) and providing numerous administrative reviews exemplifying Commerce's practice of accepting reported amortized costs).

Here, as in *Micron I*, the Court finds that Commerce has failed to articulate sufficient reasoned analysis to justify Commerce's departure from its established practice of amortizing R&D costs when such amortization is supported by the GAAP of the home country. *See id.* at 29. Again, Commerce rejected Plaintiffs' reported R&D costs despite Commerce's own acknowledgment that Plaintiffs applied Korean GAAP-consistent accounting practices and the reported costs were verified. This Court finds that Commerce failed to provide sufficient explanation or point to evidence in the record to support its decision to reject Plaintiffs' reported amortized R&D costs.

Defendant and Micron argue that Commerce has an established practice to expense R&D costs in the year incurred in administrative reviews dealing with the semiconductor industry. *Final Decision Memorandum* at 10-11[5] (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7); (Def.-Int.'s Br. at 32 n.66.) Defendant's and Defendant-Intervenor's authorities do not support their assertion. The administrative reviews cited by Defendant to demonstrate this established practice do not provide any reasoned support for Commerce's position. In those administrative reviews, Commerce expensed R&D costs, but never discussed whether or not the respondents in those

---

[5] Citing *SRAMs From Taiwan*, 63 Fed. Reg. 8,909; *SRAMs from Korea*, 63 Fed. Reg. 8,934; *DRAMs From Taiwan*, 64 Fed. Reg. 56,308.

reviews amortized the costs in their financial statements. *See, e.g., SRAMs from Taiwan*, 63 Fed.

Reg. at 8,914, 8,925[6]; *SRAMs from Korea*, 63 Fed Reg. at 8,939-40[7]; *DRAMs from Taiwan*, 64

Fed. Reg. at 56,319[8].

Commerce relies heavily on a contention that changing accounting methods across periods

of review "distorts the cost calculation in an antidumping analysis." *Final Decision Memorandum*

at 8 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). It is undisputed that Plaintiffs changed R&D

accounting methods in the past, switching from amortizing to expensing and back to amortizing

during the Fifth Administrative Review of the subject merchandise. Plaintiffs stopped expensing

R&D costs in the year incurred in 1997, and since then have utilized amortization as their R&D

accounting method. *Id.* at 8-11; (Pls.' Br. at 21.) As this Court stated in *Micron II*, "the object of

the cost of production exercise is not to capture all past expenses, but rather those expenses that

reasonably and accurately reflect a respondent's *actual* production costs for a period of review."

*Micron II*, 23 Ct. Int'l Trade at 382 (emphasis added). The distortive impact of Plaintiffs'

---

[6]     Commerce calculated R&D for SRAMs using the ratio of total semiconductor R&D to total semiconductor cost of sales for the annual period that corresponded to the period of investigation based on the theory of cross-fertilization of R&D.

[7]     Commerce "allocated semiconductor R&D to all semiconductor products" based on the practice to allocate all R&D costs to all products where those costs benefit more than one product.

[8]     The administrative review considered R&D expenses in connection with construction in progress accounts and capitalization and amortization accounting used for the testing phase of respondent's operations. Commerce noted that

> While we agree that R&D costs should be expensed as incurred, the current situation is different. . . . In this instance, [the respondent] classified some of these manufacturing costs as R&D incurred during the testing phase of operations. Although [the respondent] classified these costs as R&D, they actually are costs from the testing phase of operations," which Commerce deemed appropriate to capitalize and amortize as the respondent had in its accounting.

accounting changes prior to the Fifth Administrative Review on the actual COP of the subject merchandise for *this* POR does not seem to be as apparent as Defendant and Micron advance.

In the instant case, Commerce does not identify evidence in the record and does not show how Plaintiffs' practice of amortizing R&D costs, after previously expensing R&D costs in their accounting, distorts the reported R&D costs such that Plaintiffs' reported R&D costs do not reasonably reflect the COP for the *current* POR. In the *Final Decision Memorandum*, Commerce stated that changes in accounting methods "*can* lead to distortions for antidumping purposes because the fluctuating costs tend to overstate per unit amounts in one period and understate these amounts in other periods." *Final Decision Memorandum* at 9 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7) (emphasis added). This statement appears to be a conclusion and does not clearly indicate how Plaintiffs' changes lead to such results.

This Court finds that *Micron II* does not support Commerce's position, as the facts of that case are distinguishable. In *Micron II,* the POR that the Court examined included the transition period when the change in accounting methods from amortization to expensing R&D costs occurred. *Micron II*, 23 Ct. Int'l Trade at 381. Under those circumstances, the Court held that it was distortive for Commerce to include in the COP calculations both the current year's R&D costs and the unamortized amount of the prior year's R&D costs. *Id.* The present case is the third administrative review that has taken place after Plaintiffs changed their accounting methods. On remand, the Court instructs Commerce to reconsider Plaintiffs' assertion, supported by their "Response to the Department's Supplemental Request for Information," that all R&D costs that would have been amortized in 1996 and carried forward into this POR were fully taken into account prior to or within the Fifth Administrative Review, when Commerce used expensed R&D costs in the COP calculation. The Court further instructs Commerce to identify the distortions in

the COP for this POR that arose as a result of Plaintiffs' accounting practices and explain how the evidence in the record supports this finding.

Second, this Court finds that Commerce failed to articulate a reasoned explanation to support its rejection of Plaintiffs' practice of indefinitely deferring certain R&D expenses. Even though the Korean GAAP allows such an accounting practice, Defendant argues that deferring R&D costs is contrary to the "principle of conservatism in accounting." (Def.'s Br. at 20.) Commerce does not, however, address Plaintiffs' justification that deferring R&D costs most accurately matches future revenue to expenses. *Final Decision Memorandum* at 8-11 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). According to the matching principle, "an expense should be recorded in the period in which the product makes its contribution to revenue with the intent to ensure that expenses and revenues are recorded in the proper period." *AK Steel Corp. v. United States,* 21 Ct. Int'l Trade 1204, 1214 (1997) (referring to DONALD E. KIESO & JERRY J. WEYGANDT, INTERMEDIATE ACCOUNTING 46 (8th ed. 1995). As stated by the Court, "[c]onservatism does not supersede the matching principle, but rather is incorporated into it as a general quality found in all information used in financial statements." *Id.* at 1215.

In the instant case, Commerce flatly rejected Plaintiffs' deferral of certain R&D costs under the conservativism principle and because of the possibility that Plaintiffs will never realize revenue. Commerce made no finding that the deferral of R&D costs does not reasonably reflect the R&D costs related to the subject merchandise.

For the reasons above, these issues are remanded to Commerce with instructions to offer, if it can, a reasoned explanation supported by evidence in the record of how use of Plaintiffs' reported amortized R&D costs would not reasonably reflect Plaintiffs' actual R&D expenses of the subject merchandise for *this* POR. Additionally, the Court remands to Commerce to

reconsider and further explain why deferral of certain R&D costs does not reasonably reflect the R&D costs related to the subject merchandise.

2. Commerce's Decision to Reject Product-Specific R&D Costs (Cross-fertilization of R&D)

Commerce rejected Plaintiffs' reported product-specific R&D costs, based on Commerce's application of a theory of cross-fertilization in research and development of semiconductor products. *Final Decision Memorandum* at 11 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Commerce explained that cross-fertilization of research and development occurs "where R&D from one type of semiconductor product influenced another semiconductor product." *Id.* at 12.

A. *Plaintiffs' Contentions*

Plaintiffs provided Commerce with extensive records of R&D costs, in which memory and non-memory costs were segregated. (Pls.' Br. at 29.) Plaintiffs emphasize that these records were kept in accordance with Korean GAAP and contend that the reported costs reasonably reflect the actual cost of production of the subject merchandise. (*Id.*) Plaintiffs assert that the records provided Commerce with the ability to allocate R&D costs on a product-specific basis; therefore, only memory product R&D costs should have been included in Commerce's COP calculations for the subject merchandise. (*Id.*) Plaintiffs argue that Commerce is wrong in its cross-fertilization theory that R&D expenses associated with all semiconductor research and development yield some benefit to production of the DRAMs subject to this review. (*Id*. at 30.)

Plaintiffs argue that Commerce did not comply with 19 U.S.C. § 1677b(e), which "specifically contemplate[s] the allocation of only those costs associated with the production of the subject merchandise." (*Id*. at 27-28 (citing 19 U.S.C. § 1677b(e)(1), (2)(A)).) According to Plaintiffs, "the statute does not permit [Commerce] to attribute costs incurred in producing non-

subject merchandise to the cost of producing subject merchandise." (*Id.* at 28.) Plaintiffs note that the SAA also instructs Commerce to focus on ascertaining the costs associated with "producing and selling the product under investigation or review," indicating that Commerce bears a statutory responsibility to use only R&D costs that are "related directly to the subject merchandise." (*Id.* (citing SAA at 835).) Plaintiffs then refer to the instructions in § 1677b(f)(1)(A), which direct Commerce to calculate the COP based on the company's records, as long as the records are kept in accordance with the home country GAAP and reasonably reflect the actual cost of production. (*Id.* at 29.) Plaintiffs argue that R&D is critical to their business, and as such, they take great efforts to focus R&D resources and document the spending of R&D resources in detail, on a project-by-project basis. (*Id.*) Plaintiffs contend that Commerce elected to disregard the realities of the semiconductor industry and the specific actions of Plaintiffs when Commerce allocated a portion of R&D costs for all semiconductor products to the subject merchandise. (*Id*. at 29-30.)

Plaintiffs challenge Commerce's justification for reallocating R&D costs. (*Id.* at 30-33.) Commerce has advanced a cross-fertilization theory, supported by Dr. Murzy Jhabvala, a semiconductor device engineer at the National Aeronautics and Space Administration, which states that "the benefits from the results of R&D, even if intended to advance the design or manufacture of a specific product, provided an intrinsic benefit to other semiconductor products." *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors from the Republic of Korea,* 63 Fed. Reg. 8,934, 8,939-40 (Feb. 23, 1998) (*"SRAMs from Korea"*) (referencing Dr. Jhabvala's report dated Sept. 8, 1997: "Cross Fertilization of Research and Development of Semiconductor Memory Devices" in support of Commerce's theory (Def.'s Pub. App. Ex. 8)). Plaintiffs note that Dr. Jhabvala never specifically

addressed the subject merchandise or considered the facts on the record in this review. (*Id.* at 26-27.) Rather, Dr. Jhabvala's report was created for use in an administrative review of SRAMs. (*Id.* (citing *SRAMs from Korea*, 63 Fed. Reg. at 8,938-40).)

Plaintiffs challenge the validity of Dr. Jhabvala's support for the cross-fertilization theory further by citing to *Micron I,* where the Court rejected a cross-fertilization theory advanced by Commerce. (*Id.* at 30.) In *Micron I*, the Court found that "the defendant offers mere speculation, stating that 'there is an overlap of technology between different semiconductors, the result of which is that R&D performed for one model may provide a benefit to another model.' . . . If R&D cross-fertilization . . . is as widespread as defendant claims, one would expect an abundance of corroborating evidence which supports and expands upon the statement offered by the Micron official. Yet there is none." (*Id.* (quoting *Micron I*, 893 F. Supp. at 27).) Plaintiffs argue that Dr. Jhabvala's report fails to provide "an abundance of corroborating evidence" to support Commerce's R&D cross-fertilization theory. (*Id.*) Plaintiffs state that the report was prepared for an administrative review of different subject merchandise, by an expert who never reviewed the "confidential record of the companies he purports to evaluate." (*Id.* at 31.)

Plaintiffs argue that, even if the report is deemed to be credible, the report addresses only "the potential cross-fertilization among memory products, not cross-fertilization between memory and non-memory products." (*Id.*) Plaintiffs argue that this report demonstrates the close relationship between two memory products, SRAMs and DRAMs, and acknowledge the fact that these memory semiconductors benefit from R&D conducted specifically for memory semiconductors. (*Id.* at 32.) Plaintiffs, themselves, allocate R&D costs to both types of memory semiconductors. (*Id.*) However, Plaintiffs assert that they make a clear distinction between memory and non-memory research, and R&D costs are accounted for separately. (*Id.*)

Plaintiffs argue that R&D conducted for non-memory devices do not benefit memory devices because of "fundamental differences in function, design, production" between the products. (*Id.*) Plaintiffs maintain that Dr. Jhabvala's report fails to provide Commerce with substantial evidence to support the reallocation of R&D expenses attributable to non-memory semiconductors to the R&D expenses of the subject merchandise of this administrative review. (*Id.* at 33.)

B.      *Defendant's Contentions*

Defendant contends that all semiconductor R&D benefits all areas of semiconductor production. (Def.'s Br. at 20.) Thus, according to Defendant, Commerce properly allocated a portion of all semiconductor R&D costs over all semiconductor products, including the subject merchandise. (*Id.* at 21 (citing *Final Decision Memorandum* at 13-14 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).)

Defendant relies on the report prepared by Dr. Murzy Jhabvala, whose views have been relied on in other semiconductor proceedings. (*Id.*) Defendant acknowledges that the report was prepared for an administrative review involving SRAMs from Korea. (*Id.* (citing *SRAMs from Korea*, 63 Fed. Reg. at 8,938-940).) The report specifies the way in which SRAMs can benefit from general R&D activities conducted in the semiconductor industry, and Commerce reasons that such benefits extend to the subject merchandise DRAMs in this case. *Final Decision Memorandum* at 13-14 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). In the *Final Decision Memorandum*, Commerce states that Dr. Jhabvala provided numerous statements to support "the existence of cross-fertilization in semiconductor R&D." *Id.* Defendant maintains that application of this cross-fertilization theory is not a new policy on the issue, and that Commerce has previously reallocated R&D costs for products that benefit from cross-fertilization. (Def.'s Br. at

22 n.8.)

Defendant points out that Plaintiffs failed to submit any direct evidence contradicting the evidence relied on by Commerce, emphasizing that it is Plaintiffs' burden to create the record before the agency. (*Id.* at 23 (citing *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992)).) Defendant discounts Plaintiffs' contentions that R&D conducted for non-memory products does not benefit memory products as being unsupported by evidence in the record. (*Id.*) Defendant maintains that absent contrary evidence in the record, Commerce reasonably relied on Dr. Jhabvala's report to conclude that Plaintiffs' R&D costs should be allocated over all semiconductor products produced. (*Id.*)

C.      *Defendant-Intervenor's Contentions*

Because the Court finds Micron's contentions to be analogous to those advanced by Defendant on this issue, the Court will not recount them here, though they have been duly considered.

D.      *Analysis*

In *Micron I*, this Court rejected a cross-fertilization of R&D theory advanced by Commerce, holding that "the administrative record . . . does not support Commerce's conclusion that R&D cross-fertilization in the semiconductor industry warrants the use of aggregate data to allocate R&D costs for the subject DRAMS." *Micron I*, 893 F. Supp. at 27. Commerce advanced an analogous argument in *Micron I* to justify using aggregate data rather than product-specific data for R&D costs used to calculate COP. Commerce argued that "because the general underlying technology is the same for all semiconductor products, the benefits from the results of [R&D], even if intended to advance the design or manufacture of a specific product, provide an intrinsic benefit to other semiconductor products." *Id.* (citing *Final Determination of Sales at*

*Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above From the Republic of Korea* , 58 Fed. Reg. 15,467, 15,472 (Mar. 23, 1993)). The evidence on the record in this case seems to differ from *Micron I* only with the introduction of the Dr. Jhabvala report. Commerce relies on this report to provide the substantial evidence that the Court found was lacking in *Micron I*.

This Court has "recognize[d] that R&D cross-fertilization *may* justify allocating R&D costs on an aggregate, rather than product-specific, basis." *Micron I*, 893 F. Supp. at 27 (emphasis added). However, such an allocation is appropriate only "if substantial record evidence supports a determination that the subject merchandise benefits from R&D expenditures earmarked for non-subject merchandise." *Id.* The Court, in *Micron I*, continued that "the factual premise upon which Commerce bases its choice of methodology must be supported by substantial evidence on the record," regardless of the fact that Commerce's methodology may have "intuitive appeal." *Id.*

In this case, the Court finds that Dr. Jhabvala's report does not provide substantial evidence to support the existence of cross-fertilization of R&D for the subject merchandise. Dr. Jhabvala's report is based upon different products produced by different parties under conditions that have not been demonstrated to be similar to those of the present case. While Plaintiffs acknowledge that there is a close relationship between memory semiconductor products, that close relationship does not necessarily lead to the conclusion that because memory products by a different company benefitted from some R&D conducted for non-memory products at that company, the subject merchandise in this review must have also benefitted from R&D activities for non-memory products produced by Plaintiffs.

Commerce historically has excluded R&D expenses for non-subject merchandise where a

respondent maintains product-specific R&D costs and the expense "benefitted *only* non-subject merchandise." (Def.'s Br. at 22 n.8.[9]) It is clear that Plaintiffs have the burden of creating the record. *See Tianjin Mach. Imp. & Exp. Corp.*, 806 F. Supp. at 1015. In building the record for the present case, Plaintiffs provided Commerce with R&D costs accounted for on a product-by-product basis. (*Verification of the Response of Hyundai Electronics Industries, Co., Ltd. and Hyundai Electronics America for 1999 Administrative Review of Dynamic Random Access Memory Semiconductors of One Megabit and above from Korea*, Ex. 20 (Pls.' Conf. App. Ex. 3).) The Court acknowledges that, even though a producer is able to account for R&D on a product-specific basis, there may still be cross-fertilization of R&D. However, the issue is whether the R&D conducted for non-subject merchandise benefitted the subject merchandise in this instance. Here, as in *Micron I*, the Court finds that "Commerce fails to direct the court to any record evidence of R&D cross-fertilization" that clearly demonstrates a benefit to the subject merchandise. *Micron I*, 893 F. Supp. at 27.

Accordingly, this issue is remanded to Commerce to further explain its conclusion that R&D for the subject merchandise benefits from R&D activities for non-memory products and further point to substantial evidence in the record to justify such a conclusion. In the alternative,

---

[9]  Citing, e.g., *Large Power Transformers from Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed. Reg. 45,767, cmt.3 (Oct. 5, 1992) ("R&D expenses incurred for the specific development of products not subject to this administrative review may be excluded from the calculation of constructed value."); *High-Tenacity Rayon Filament Yarn from Germany; Final Results of Antidumping Duty Administrative Review*, 60 Fed. Reg. 15,897, 15,899 (Mar. 28, 1995); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed. Reg. 39,729, 39,751 (July 26, 1993); *Final Determination of Sale at Less Than Fair Value: Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea*, 55 Fed. Reg. 32,659, cmt. 29 (Aug. 10, 1990).

Commerce, should it find it necessary, is directed to make any recalculations that may be required.

### III. Commerce's Decision to Reject the Average Useful Lives for Hynix's Fixed Assets is Remanded.

#### A. *Plaintiffs' Contentions*

Plaintiffs assert that Commerce erred in rejecting the revision of the average useful lives ("AULs") of Plaintiffs' fixed assets. (Pls.' Br. at 34.) In the Seventh Administrative Review, Commerce rejected Plaintiffs' revised AULs and corresponding adjustments to their depreciation expenses. *Final Decision Memorandum* at 17-18 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Instead, Commerce used Plaintiffs' pre-1998 AULs to determine Plaintiffs' depreciation expenses. *Id.* Plaintiffs explain that they revalued their fixed assets (property, plant, and equipment) effective October 1, 1998, in accordance with Korean Asset Revaluation Law. (Pls.' Br. at 33.) The revaluation was based upon a report by the Korean Appraisal Board, which is comprised of independent appraisers. (*Id.*) Plaintiffs submitted substantial portions of the appraiser's report to Commerce for this administrative review. (*Id.*)

The appraiser's report substantially increased the value of Plaintiffs' fixed assets to reflect current replacement costs. (*Id.*) The appraiser's report concluded that the AULs that Plaintiffs used to calculate the depreciation of their equipment were understated. (*Id.*) In accordance with the appraiser's report, Plaintiffs revised the AULs of the equipment and based their reported depreciation expenses on these revisions. (*Id.*)

Plaintiffs state that Commerce rejected Plaintiffs' revised AULs despite the fact the AULs were in accordance with industry standards, had been historically used in Plaintiffs' accounting statements, and were approved by the Korean Appraisal Board. (*Id.* at 34-36.) Plaintiffs argue that Commerce's rejection of Plaintiffs' revised AULs is not supported by substantial evidence on

the record.  (Pls.' Br. at 34.)

Plaintiffs set forth the following facts to establish substantial evidence to support the revised AULs: (1) the revision was based upon an independent auditor's evaluation that adjustments in AULs were warranted; (2) similar revisions were conducted throughout the semiconductor industry in Korea; (3) Plaintiffs provided Commerce with the world-wide DRAMs practice of establishing AULs in their Supplemental Questionnaire; (4) the industry AULs are all greater than five years; and (5) Defendant-Intervenor's AULs for machinery and equipment range from two to twenty years.  (*Id*. at 35-36.)

Plaintiffs assert that the revised AULs more accurately reflect the useful lives of their equipment.  (*Id.* at 38.)  Therefore, the revised AULs support the purpose of depreciating assets, which is to accurately reflect equipment costs associated with the production of the subject merchandise.  (*Id.*)

Plaintiffs contend that Commerce ignored its own practice of accepting "non-distortive changes in useful lives adopted by respondents in accordance with home country GAAP."  (*Id.* at 40.)  Plaintiffs contend that Commerce has stated that "[g]enerally accepted accounting principles which pertain to a change in the estimated useful life apply to situations were new events have occurred, additional experience has been acquired, or additional information has been obtained so as to make the original estimate inaccurate."  (*Id.* at 41 (citing *Erasable Programmable Read Only Memories (EPROMs) From Japan; Final Determination of Sales at Less than Fair Value*, 51 Fed. Reg. 39,680, 39,684 (Oct. 30, 1986)).)  Plaintiffs note that in prior cases, Commerce rejected revised AULs only where there was no factual basis for the revision.  (*Id.* at 41-42 (citing *Final Determination of Sales at Less Than Fair Value: Oil Country Tubular Goods from Mexico*, 60 Fed. Reg. 33,567, 33,573 (June 28, 1995)).)  Here, Plaintiffs assert that they supplied Commerce

with sufficient factual data to support the use of the revised AULs. (*Id.* at 42.)

      B.     *Defendant's Contentions*

Defendant argues that Commerce's determination to reject Plaintiffs' revised AULs and use Plaintiffs' pre-1998 AULs was reasonable, supported by substantial evidence, and was consistent with both the antidumping statute and Commerce's past practice. (Def.'s Br. at 24.) Defendant provides the following reasons for Commerce's rejection of Plaintiffs' revised adjustments of AULs: (1) the revisions deviate from the common practice of the industry, which applies a three to five year AUL to semiconductor machinery; and (2) the revisions deviate from Plaintiffs' historical practice. (*Id.* at 26.) Defendant argues that the fact that the revised recommendations for AULs were provided by an independent appraiser, does not change the fact that the recommendations are not standard industry practice. (*Id.*) Further, Defendant notes that Commerce has not found a change in the common industry practice regarding AULs since 1998, when Commerce accepted Plaintiffs' previous revisions in AULs. (*Id.*)

Defendant cites to 19 U.S.C. § 1677b(f)(1)(A), which states that Commerce shall calculate costs based on the records of the exporter or producer, "if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." (*Id.* at 24 (citing 19 U.S.C. § 1677b(f)(1)(A)).) As stated earlier, the statute also requires Commerce to consider if the cost allocations have historically been used, particularly to establish appropriate depreciation periods. 19 U.S.C. § 1677b(f)(1)(A). Defendant cites to the SAA to further justify Commerce's determination to adjust depreciation expenses. (Def.'s Br. at 24-25.)

Defendant acknowledges that Commerce has, in the past, accepted revised AULs. (*Id.* at 25.) However, Defendant maintains that in those cases, there was no evidence in the record

showing that the revised AULs were overstated. (*Id.* at 27-28 (referencing *Oil Tubular Country Goods from Mexico*, 60 Fed. Reg. at 33,573).) Defendant maintains that Commerce found many of the AULs in this case were overstated. (*Id.* (citing *Final Decision Memorandum* at 18 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7)).)

C. *Defendant-Intervenor's Contentions*

Because the Court finds the majority of Defendant-Intervenor's arguments on this issue substantially similar to those presented by Defendant, the Court will not recount them in their entirety, however, they have been duly considered.

D. *Analysis*

Title 19 U.S.C. § 1677b(f)(1)(A) provides that Commerce will use a respondent's reported costs, provided that the records are kept in accordance with home country GAAP and reasonably reflect the costs of producing the merchandise. 19 U.S.C. § 1677b(f)(1)(A). Here, Commerce rejected revised AULs that were consistent with Korean GAAP and failed to provide a reasoned analysis for its decision. Thus, the Court finds Commerce's decision to reject Plaintiffs' revised AULs is not supported by substantial evidence on the record.

Commerce found Plaintiffs' revisions to the AULs deviated from the common practice of the industry, which is to apply a three to five year AULs to semiconductor equipment. *Final Decision Memorandum* at 17-18 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Although, Commerce seemingly observed no change in the common industry practice regarding AULs since 1998, there appears to be no indication that Commerce considered Plaintiffs' reported industry AULs, which demonstrate a much broader range than the three-to-five-year AUL Commerce states is the industry standard. *See* "Hyundai's Resp. to Second Supplemental Questionnaire," Ex. SS-14 (Mar. 5, 2001) (Pub. Doc. No. 42) (BPI Doc. No. 7) (Pls.' Conf. App. Ex. 5).

Commerce seems to ignore its own historical practice of accepting changes in AULs "where new events have occurred, additional experience has been acquired or additional information has been obtained, so as to make the original estimate inaccurate." *Erasable Programmable Read Only Memories (EPROMs) from Japan,* 51 Fed. Reg. at 39,684. In the present case, additional information has been provided by Plaintiffs that could justify revisions to AULs, provided that those revisions reasonably reflect the COP. This Court notes that § 1677b(f)(1)(A) instructs Commerce to ascertain whether or not reported costs reasonably reflect the COP and such a determination should not be limited exclusively to whether or not certain accounting practices have been "historically utilized." *See* 19 U.S.C. § 1677b(f)(1)(A).

For the reasons stated above, this Court finds that Commerce's decision to reject Plaintiffs' revised AULs is unsupported by substantial evidence on the record or is otherwise not in accordance with law. This Court remands to Commerce to explain how the revised recommendations for AULs provided by an independent appraiser are not standard industry practice and how and where in the record many of the AULs were overstated. Commerce should also explain how use of the reported AULs would not reasonably reflect Plaintiffs' cost of production. Should Commerce on this remand determine it is necessary to recalculate, it is directed so to do.

**IV.** **Commerce's Decision to Deny an Offset to Plaintiffs' Foreign Currency Translation Losses is Supported by Substantial Evidence or Otherwise in Accordance with Law**

A. *Plaintiffs' Contentions*

Plaintiffs argue the increase in value of their fixed assets constitutes income that can be

used to offset their foreign currency translation losses.[10] (Pls.' Br. at 42.) In 1998, Plaintiffs' assets were revalued because the depreciation of the Korean won in late 1997. (*Id.* at 43.) Plaintiffs explain that in applying the "matching principle" of accounting, Plaintiffs used "the increase in value of [Plaintiffs'] fixed assets over their originally stated won values" to "offset unrealized foreign exchange translation losses that were generated principally in 1997 and deferred until later years." (*Id.*) According to Plaintiffs, treatment of the revalued assets as offsets to foreign currency translation losses is consistent with the "matching principle" of accounting because the "foreign currency translation losses and [asset] revaluation gains . . . both relate to the dollar-based assets and liabilities on the balance sheet." (Pls.' Reply Br. at 24.) Plaintiffs maintain that they appropriately applied the "matching principle," which dictates that any increase in asset values resulting from devaluation be matched to any devaluation-driven increase in liabilities. (Pls.' Br. at 47.) Plaintiffs assert that the United States' and Korea's GAAP, as well as Commerce, endorse the application of the matching principle. (*Id.* at 43 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea,* 64 Fed. Reg. 73,196, 73,204 (Dec. 29, 1999)).)

Plaintiffs argue that it is appropriate to offset deferred foreign currency translation losses by the increase in the value of the fixed assets for two reasons: (1) the foreign currency translation losses were incurred on loans that were used to purchase those assets; and (2) the increase in the value of the assets is due in large part to the decline in the value of the won. (*Id.* at 45.) Plaintiffs

---

[10] Foreign currency translation losses are associated with the re-payment of debt. In this case, foreign currency translation losses were caused by the rapid devaluation in the Korean won, which increased Plaintiffs' costs of repaying dollar-denominated loans in won and reflect "having to spend more won to pay back the same dollar value loan." *Final Decision Memorandum* at 3 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7).

argue that if Commerce "were to rule that the [revaluation of fixed assets] cannot be used to offset the deferred foreign currency translation losses, [Commerce] would be capturing the effect of the won devaluation twice -- once on the value of the equipment and once on the change in the principal payments." (*Id.* at 46.)

Plaintiffs conclude that Commerce should offset Plaintiffs' deferred foreign currency translation losses in 1996 and 1997 with the revaluation of the fixed assets, as suggested in Plaintiffs' Second Supplemental Questionnaire Response. (*Id.* at 48 (citing "Hyundai's Resp. to Second Supplemental Questionnaire,"Ex. SS-6 (Mar. 5, 2001) (Pub. Doc. No. 42) (BPI Doc. No. 7) (Pls.' Conf. App. Ex. 5)).) Plaintiffs assert that by denying the offset, Commerce doubly counts the effect of exchange rate fluctuations on production costs. (*Id.* at 46.)

B.      *Defendant's Contentions*

Defendant contends that Commerce rejected Plaintiffs' offset of revaluation of the fixed assets against deferred foreign currency translation losses based on the rationale that the revaluation of assets and foreign currency translation losses are not linked. (Def.'s Br. at 29.) In the *Final Decision Memorandum,* Commerce explains that foreign currency exchange losses and the revaluation of fixed assets are not linked because each balance sheet entry captures different accounting elements. *Final Decision Memorandum* at 3-4 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Defendant observes that under Korean GAAP, fixed-asset revaluation is intended to capture the effect of inflation and to match current revenues with fixed asset costs in current terms. (Def.'s Br. at 29.) However, foreign currency translation losses are intended to capture the effect of exchange fluctuations on financing. (*Id.*)

Commerce notes that Plaintiffs treated revaluation of fixed assets and foreign currency translation losses differently in the administrative review than in their own accounting. *Final*

*Decision Memorandum* at 3-4 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). In the Plaintiffs' accounting records, both items were treated as adjustments to the equity section of Plaintiffs' balance sheet and did not flow through to their income segments. *Id.* However, for submission in this administrative review, Plaintiffs excluded both items from the reported costs, claiming that the items offset one another. *Id.*

Commerce rejected the offset because the revaluation of the fixed assets does not represent income during the year. *Id.* at 4-5. Commerce notes that in real terms, the company is in the same position with the same assets, despite the "increase value" of the assets due to the devaluation of the Korean won. *Id.* Commerce reasoned that revaluation of fixed assets is most accurately accounted for in the context of depreciation. *Id.* at 4. Commerce notes that the purpose of depreciation expenses is to "spread the initial cost of acquiring a fixed asset over the useful life of that asset in order to match the resulting expense to the revenues of the corresponding period." *Id.* Commerce used the revaluation of the fixed assets to adjust the cost basis for the fixed assets, which impacted depreciation expenses. *Id.* at 4-5. Accordingly, Commerce refused to include the revaluation of the fixed assets in the reported costs. *Id.*

Commerce also rejected Plaintiffs' treatment of foreign currency translation losses because Plaintiffs changed accounting methods created distortions, specifically due to Plaintiffs' failure to account for portions of losses from prior periods. *Id.* at 5-6. Commerce explained in detail its practice of including foreign currency translation gains and losses related to current debt in COP and Constructed Value calculations because they are monetary gains or losses. *Id.* at 5. Commerce notes that Plaintiffs have treated foreign currency translation losses differently within the same year. *Id.* at 5-6. Specifically, in 1998, while Plaintiffs "wrote off" the losses to the equity section of the balance sheet, Plaintiffs continued to amortize gains. *Id.* at 5. Commerce

found that this treatment reduced the impact of losses and increased the impact of the gains. *Id.* at 5-6. Thus, Commerce continued to include an amortized portion of the 1997 long-term exchange losses in the respondent's COP. *Id.* Defendant acknowledges that Korean GAAP permit Plaintiffs to treat foreign currency translation losses in this manner. (Def.'s Br. at 32-33.) Defendant asserts, however, that this treatment did not reasonably reflect the costs associated with producing the subject merchandise. (*Id.*)

Defendant rejects Plaintiffs' assertion that the "matching principle" of accounting calls for an offset to their foreign exchange currency losses for revaluation of their fixed assets. (*Id.* at 33.) Under the matching principle, the cost of an asset is spread over its useful life or the period in which it produces merchandise that generates revenue. (*Id.*) Defendant interprets this to provide support for the proposition that "the full effect of the asset revaluation has been properly matched against the revenue received from the products that the asset was used to produce by recording the depreciation on the revalued asset amounts." (*Id.* at 33-34.) Defendant identifies the amortized portion of Plaintiffs' foreign currency translation losses as the financing costs of the current period. (*Id.* at 34.) Defendant asserts that financing costs incurred in the period cannot be matched to sales revenues because no direct relationship exists between financing costs and sales revenues. (*Id.*) Rather, Defendant argues that financing costs are considered expenses related to the current period. (*Id.*) Defendant maintains that Commerce's treatment of both the asset revaluation and the translation losses was proper because the treatment is supported by substantial evidence on the record.

C.     *Defendant-Intervenor's Contentions*

Because the Court finds Defendant-Intervenor's arguments on this issue are substantially similar to those presented by the Defendant, the Court will not recount them in this opinion,

although they have been duly considered.

        D.     *Analysis*

This Court finds that Commerce's decision to reject Plaintiffs' proposed offset for asset revaluation against Plaintiffs' foreign currency translation gains and losses is supported by substantial evidence on the record or is otherwise in accordance with law. Defendant provides a well-reasoned analysis to support Commerce's decision to reject the offset proposed by Plaintiffs. Contrary to Plaintiffs' contentions, the Court finds that Commerce clearly understood Plaintiffs' proposed accounting methodologies and provided articulate reasons for rejecting those methods. Commerce reasonably rejected Plaintiffs' attempt to use the matching principle of accounting as the justification for offsetting foreign currency translation losses with asset revaluation.

Commerce reasonably observed that fixed asset values are appropriately treated differently from foreign currency translation losses. The fact that the devaluation of the Korean won increased the value of the assets in won that were purchased with dollar-denominated debt does not create an increase in income on Plaintiffs' balance sheets. Contrary to Plaintiffs' assertions, the value of the asset did not increase in real terms. Rather, the book value in Korean won increased, but as argued by Defendant, actual assets purchased by the U.S. dollar-denominated loans remained the same.

The Court finds that the evidence on record provides substantial support for Commerce's position that value of currency is different than the value of an asset and fluctuations in currency values cannot be interchanged with fluctuations in asset values. While it is true that more Korean won is required to purchase the same asset in present value terms, the value of that asset does not demonstrate a "profit" on the balance sheet. Rather, as Defendant notes, Commerce reasoned that the revaluation of the fixed assets is appropriately accounted for in an adjustment of the cost basis

for depreciation purposes. *Final Decision Memorandum* at 4 (Pub. Doc. No. 72) (Def.'s Pub. App. Ex. 7). Failure to adjust the cost basis for depreciation purposes understates the depreciation for the current year. (*Id.*) This Court finds Commerce's determinations on this issue are supported by substantial evidence on the record or otherwise in accordance with law. Therefore, this Court affirms Commerce's determination on this issue.

## CONCLUSION

Upon consideration of Plaintiffs' Rule 56.2 motion for judgment upon the agency record, Defendant's and Defendant-Intervenor's responses, and Plaintiffs' reply, Plaintiffs' motion is denied. The Department of Commerce's *Final Results* is affirmed in part and remanded in part. The Court remands to Commerce for reconsideration and further explanation its decision to reject Plaintiffs' reported R&D costs and Plaintiffs' revised AULs. Plaintiffs' motion for oral argument is denied.

 

 

_____
Gregory W. Carman,
Chief Judge

Dated: January 31, 2003
      New York, New York