# United States Court of Appeals for the Federal Circuit

---

**XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD.,**
*Plaintiff*

**SHANXI PIONEER HARDWARE INDUSTRIAL CO., LTD., BUILDING MATERIAL DISTRIBUTORS, INC.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MID CONTINENT STEEL& WIRE, INC.,**
*Defendants-Appellees*

---

2021-2205, 2021-2227

---

Appeals from the United States Court of International Trade in Nos. 1:20-cv-00103-LMG, 1:20-cv-00111-LMG, 1:20-cv-00116-LMG, Senior Judge Leo M. Gordon.

---

Decided: September 23, 2022

---

JOSEPH DIEDRICH, Husch Blackwell LLP, Madison, WI, argued for all plaintiffs-appellants. Plaintiff-appellant Shanxi Pioneer Hardware Industrial Co., Ltd. also represented by JEFFREY S. NEELEY, STEPHEN W. BROPHY, Washington, DC.

LIZBETH ROBIN LEVINSON, Fox Rothschild LLP, Washington, DC, for plaintiff-appellant Building Material Distributors, Inc. Also represented by BRITTNEY RENEE POWELL, RONALD MARK WISLA.

ROBERT R. KIEPURA, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by SOSUN BAE, BRIAN M. BOYNTON, PATRICIA M. MCCARTHY; AYAT MUJAIS, International Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, argued for defendant-appellee Mid Continent Steel & Wire, Inc. Also represented by LAUREN FRAID, JENNIFER MICHELE SMITH.

————————————

Before MOORE, *Chief Judge*, NEWMAN and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

Shanxi Pioneer Hardware Industrial Co., Ltd. (Pioneer) and Building Material Distributors, Inc. (BMD) appeal the decision of the United States Court of International Trade affirming the United States Department of Commerce's final results in the tenth administrative review of the antidumping order on certain steel nails from the People's Republic of China. Based on its finding that Pioneer did not cooperate to the best of its ability with Commerce's request for information, Commerce applied adverse facts available against Pioneer and assigned an antidumping margin of 118.04 percent to Pioneer. We affirm the Court of International Trade's judgment based on its conclusion that Commerce's decision to apply adverse facts available was supported by substantial evidence.

BACKGROUND

Commerce protects domestic producers from unfair trade practices, such as dumping, by investigating whether imported merchandise is being sold in the United States at less than fair value and imposing antidumping duties on subject merchandise to level the playing field. 19 U.S.C. § 1673. To determine the fair value of merchandise from non-market economies, such as China, Commerce constructs a respondent-specific per unit "normal value" representing the cost of production of the merchandise. Commerce uses this normal value to determine whether the merchandise is being dumped. If so, Commerce calculates a dumping margin and a corresponding duty assessment rate for that respondent and issues an antidumping duty order. At the request of interested parties, Commerce reviews and reassesses its antidumping duty orders annually after the initial investigation. § 1675(a).

This story begins in 2008. Mid Continent Steel & Wire, Inc. (Mid Continent) petitioned Commerce to investigate the importation and sale of certain steel nails from China. During this initial investigation, Commerce determined that the subject merchandise was being dumped and issued an antidumping duty order. Notice of Antidumping Duty Order: Certain Steel Nails From the People's Republic of China, 73 Fed. Reg. 44961 (Aug. 1, 2008). Because Commerce has designated China as a non-market economy, Commerce applies a rebuttable presumption that all Chinese producers are subject to government control and therefore should be assigned a country-wide dumping margin. Commerce selects a number of producers or importers for individual examination to determine this country-wide dumping margin and other margins. Pioneer—a Chinese producer and importer/exporter of steel nails (the subject merchandise)—applied for and received a separate rate in this initial antidumping investigation. In other words, Pioneer demonstrated that it was independent of government control and should be assessed a rate different from the

country-wide rate.  Commerce did not select Pioneer for individual examination.  Commerce set the country-wide margin for China at 118.04 percent.  *Id.* at 44965.

In 2013, Commerce published the results of its third administrative review of the antidumping order, covering merchandise entries that occurred between August 1, 2010, and July 31, 2011.  Commerce announced its intention to

> require that [a respondent in the third administrative review] and *all other future respondents* for this case report all FOPs [factors of production] data on a CONNUM-specific basis using all product characteristics in subsequent reviews, as documentation and data collection requirements should now be fully understood by [the particular respondent] and all other respondents.

Certain Steel Nails From the People's Republic of China; Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review, A-570-909, ARP 10–11, at 36–40 (Dep't of Com. Mar. 5, 2013) (*2010–2011 Final IDM*) (emphasis added); *see also* Certain Steel Nails From the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 16651 (Mar. 18, 2013).

"'CONNUM' is a contraction of the term 'control number,' and is Commerce jargon for a unique product." *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 520 F. Supp. 3d 1314 (Ct. Int'l Trade June 9, 2021) (*CIT Op.*). A particular CONNUM roughly corresponds to a particular product defined "in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding." *Id.* Commerce defines CONNUMs by identifying "key physical characteristics of the subject merchandise" that are "commercially meaningful" in the United States marketplace and "have an impact on costs of production." Gov't Br. 7.  CONNUM-specific data allows Commerce to perform comparisons of its constructed normal values to

export prices on as precise a basis as possible. *CIT Op.*, 520 F. Supp. 3d. at 1322; Gov't Br. 7–8. Commerce has required reporting factors of production (FOPs) on a CONNUM-specific basis using similar language in various antidumping proceedings for over a decade.

In 2018, Commerce initiated the administrative review underlying this appeal, the tenth administrative review of the antidumping order covering the period of August 1, 2017, to July 31, 2018. Commerce selected three mandatory respondents, including Pioneer, for examination from among the companies that requested to be considered separate rate companies. Certain Steel Nails from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018, 84 Fed. Reg. 55906 (Oct. 18, 2019) (*2017–2018 Preliminary Results*). This marked the first time that Pioneer was selected as a mandatory respondent in the course of this antidumping proceeding and was therefore the first time that Pioneer had an individual obligation to cooperate with Commerce's investigation, including responding to Commerce's questionnaires designed to obtain information necessary to calculate dumping margins.

Commerce issued questionnaires to the mandatory respondents, requesting FOP data for the subject merchandise using "actual quantities consumed . . . on a CONNUM-specific basis." J.A. 279. The questionnaire stated that a respondent could alternatively provide FOP data using a different allocation methodology if the respondent provided a "detailed explanation of all efforts undertaken to report the actual quantity . . . on a CONNUM-specific basis," how the estimated FOP consumption was derived, and "why the methodology[] selected is the best way to accurately demonstrate an accurate consumption amount." *Id.* Pioneer responded to the questionnaire, representing that it had "reported the factors of production (FOPs) using actual

quantities consumed to produce the merchandise under investigation on a CONNUM-specific basis." J.A. 824.

As part of the administrative review process, interested parties can submit comments to Commerce regarding the respondents' responses. In this case, Mid Continent challenged the integrity of Pioneer's data, asserting that although Pioneer "indicate[d] that it ha[d] provided CONNUM-specific FOPs, it clearly ha[d] not." J.A. 1012 (footnote omitted). Explaining that Pioneer had "made no attempt whatsoever to differentiate" its estimated FOP values on a product-by-product basis "in any way," Mid Continent contended that this "failure to calculate product-specific FOPs is highly distortive as it allocates consumption equally across all CONNUMs and distorts the margin calculations." J.A. 1013.

Based on Mid Continent's comments, Commerce issued Pioneer a supplemental questionnaire seeking clarification. Again, Commerce asked Pioneer to "provide a narrative description and any supporting documentation to explain why [it was] unable to provide more specific material input FOPs on a CONNUM or product group basis." J.A. 1026–27. And again, Commerce offered Pioneer the option to develop an alternative "methodology that captures consumption differences based on the different sizes/weights of the nails produced" to the extent Pioneer did not "track these material consumptions on a more specific basis." J.A. 1027. Pioneer responded to Commerce's supplemental questionnaire, this time admitting that it was not providing the FOPs on a CONNUM-specific basis. J.A. 1042–45. Instead, Pioneer repeatedly asserted that it had "no cost records that would support any other allocation methodology" and provided no further explanation. *Id.*

On October 18, 2019, Commerce published its preliminary results. *2017–2018 Preliminary Results*, 84 Fed. Reg. 55906. **[J.A. 82]** Using the FOP data that Pioneer provided in its initial questionnaire response, Commerce

calculated a dumping margin of 13.88 percent for Pioneer. *Id.* at 55907. At Commerce's invitation, Mid Continent filed comments on the preliminary results, highlighting Pioneer's "fail[ure] to provide information critical to the calculation of accurate margins," despite the fact that it had an "opportunity to remedy these deficiencies" in its supplemental response. J.A. 1192. According to Mid Continent, despite Commerce's "specific[] instruct[ions to] Shanxi [Pioneer] to revise its . . . FOPs to capture product distinctions," or, alternatively, to "develop a methodology to take distinctions in weight, size, or surface area into account," Pioneer did neither. J.A. 1194. Mid Continent asserted that, as the producer of the subject merchandise, Pioneer "[c]learly . . . possesse[d] knowledge and/or records . . . of its products that would have allowed it to develop more accurate FOP allocation methodologies." *Id.* From Mid Continent's perspective, Pioneer's failure to do so "rendered [its] response unusable for margin calculations." J.A. 1192.

On April 22, 2020, Commerce published its final results. Commerce reconsidered Pioneer's rate assignment in view of the comments submitted by Mid Continent. Because Pioneer "withheld information" requested of it, "failed to provide data in the form and manner requested," and "significantly impeded" the administrative review, Commerce resorted to facts otherwise available (FA). *Certain Steel Nails from the People's Republic of China; Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review*, A-570-909, ARP 17–18, at 34 (Dep't of Com. Apr. 15, 2020) (*2017–2018 Final IDM*). In particular, Commerce noted that although "Pioneer had notice of the general record-keeping requirements relating to this order," Pioneer "did not heed . . . instructions to maintain appropriate data such that it could properly report FOPs." *Id.* at 32. And, Commerce explained, applying adverse inferences when selecting from facts available (AFA) was also warranted because Pioneer failed to act to the best of its ability to comply with a

request for information. Specifically, Pioneer's failure to "maintain[] adequate records" or "develop[] a methodology to report product-specific costs," *id.* at 34, despite "multiple opportunities" throughout the underlying administrative review, constituted a failure to act to the best of its ability, *id.* at 32. Commerce assigned a margin of 118.04 percent—the country-wide rate for China—to Pioneer.

Pioneer and two separate rate respondents, BMD and Xi'an Metals & Minerals Import & Export Co., appealed Commerce's final results to the Court of International Trade, which consolidated the cases. *CIT Op.*, 520 F. Supp. 3d at 1318–19. The respondents argued that Commerce violated the Administrative Procedure Act (APA) when it announced it would require future respondents to comply with the CONNUM-specific reporting requirement. Pioneer argued that requiring respondents to "report CONNUM-specific costs amount[ed] to a 'rule' that Commerce 'promulgated . . . without proper notice and comment rule making'" under the APA. *Id.* at 1322–23 (alteration in original). Furthermore, Pioneer complained that Commerce "denied respondent [Pioneer] the opportunity to use another allocation methodology by requiring a more specific method of reporting and recordkeeping." *Id.* at 1327.

The Court of International Trade sustained Commerce's final results. The court explained that "Commerce's adoption of a CONNUM-specific reporting requirement d[id] not amount to the implementation of a legislative rule that would require notice-and-comment rulemaking." *Id.* at 1323. And because Commerce "determined that it needed data that more accurately reflected the costs associated with the production and sale of the subject merchandise," Commerce's announcement of the CONNUM-specific reporting requirement was "a statement of policy" and not an "explicit invocation of general legislative authority" that would have triggered the notice-and-comment requirement of the APA. *Id.* at 1324.

Additionally, the court determined that substantial evidence supported Commerce's application of AFA. Specifically, the court explained that despite having been on notice of Commerce's reporting requirement since 2013 and having been given multiple opportunities throughout the course of the underlying administrative review to comply or explain why it could not comply, Pioneer did neither. The court concluded that these facts supported Commerce's determination that Pioneer failed to cooperate to the best of its ability, warranting application of AFA.

Pioneer and BMD appeal. Our court consolidated the appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review de novo the Court of International Trade's judgments, reapplying the same statutory standard of review as that court. *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1233 (Fed. Cir. 2022). Commerce's "special expertise in administering the anti-dumping law entitles its decisions to deference." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citing cases). Both the Court of International Trade and our court review Commerce's findings for substantial evidence. *Id.* Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support a conclusion." *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840 (Fed. Cir. 2020) (cleaned up).

On appeal, Pioneer[1] primarily argues that Commerce's use of FA and AFA based on Pioneer's failure to comply with the CONNUM-specific reporting requirement was unlawful because the CONNUM-specific reporting requirement is a legislative rule that should have been

---

[1]    BMD joined Pioneer in its opening and reply briefs and waived oral argument.

10   XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD. v. US

promulgated through notice-and-comment rulemaking. Separately, Pioneer asserts that Commerce's decision to apply AFA and assignment of the 118.04 percent margin was unsupported by substantial evidence.  We address each issue in order.

I

We begin with Pioneer's arguments that the CONNUM-specific reporting requirement is unlawful.  Pioneer asserts that Commerce's CONNUM-specific reporting requirement is a rule promulgated without the requisite notice-and-comment rulemaking procedure under the APA and therefore null. Appellants' Br. 20–21.  In the alternative, Pioneer claims that even if the CONNUM-specific reporting requirement is exempt from notice-and-comment rulemaking, the rule is inconsistent with the Tariff Act of 1930 and therefore invalid. *Id.* at 31.  We address each argument in turn.

A

Under the APA, certain proposed "legislative rules" advanced by agencies must be promulgated through notice-and-comment rulemaking.  5 U.S.C. § 553(b).  The APA, however, makes an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  § 553(b)(3)(A).  Our court has articulated the distinction between legislative rules, which require notice-and-comment rulemaking, and other rules that do not:  "Legislative rules alter the landscape of individual rights and obligations, binding parties with the force and effect of law; interpretive rules, on the other hand, merely clarify existing duties for affected parties." *Stupp Corp. v. United States*, 5 F.4th 1341, 1352 (Fed. Cir. 2021) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019)); *see also Splane v. West*, 216 F.3d 1058, 1063 (Fed. Cir. 2000).

On appeal, Pioneer "direct[s] our attention to *American Mining Congress v. Mine Safety & Health Administration*,

995 F.2d 1106 (D.C. Cir. 1993)," where our sister circuit held that a rule is a legislative rule "if any one of [a number of] conditions are satisfied." *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1376 n.11 (Fed. Cir. 2001) (citing *Am. Mining*, 995 F.2d at 1112); *see* Appellants' Br. 22.   Here, Pioneer argues that the fourth *American Mining* factor—"whether the rule effectively amends a prior legislative rule," *Veterans' Advocates*, 260 F.3d at 1376—is satisfied.  Specifically, Pioneer argues that Commerce's CONNUM-specific reporting requirement is a legislative rule because it "effectively amends" Commerce's existing regulation, 19 C.F.R. § 351.401(g).

Section 351.401(g) recites, in relevant part:

**(2) Reporting allocated expenses and price adjustments.** Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

**(3) Feasibility.** In determining . . . whether an allocation is calculated on as specific a basis as is feasible, the Secretary will take into account the records maintained by the party in question in the ordinary course of its business, as well as such factors as the normal accounting practices in the country and industry in question and the number of sales made by the party during the period of investigation or review.

§ 351.401(g)(2), (3).

According to Pioneer, § 351.401(g) requires only that respondents offer records that are maintained "in the ordinary course of [the respondent's] business" and according to "normal accounting practices in the country and

12   XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD. v. US

industry," or according to generally accepted accounting practices (GAAP). Appellants' Br. 22–23. Pioneer argues that, in contrast, the CONNUM-specific reporting requirement "requires all foreign exporters and producers of nails to maintain records in a particular way—regardless of GAAP." *Id.* at 25. Pioneer further contends that the CONNUM-specific requirement relieves Commerce of its obligation to consider the feasibility of the reporting method requested and the form of the records kept by the exporters and producers. Pioneer thus asserts that the CONNUM-specific requirement alters the legal responsibilities of all respondents and of Commerce itself and therefore does not merely clarify the regulation.

As we have previously held, however, "[a] rule does not . . . become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." *Veterans' Advocates*, 260 F.3d at 1376 (alterations in original) (quoting *Am. Mining*, 995 F.2d at 1112); *see also CIT Op.*, 520 F. Supp. 3d at 1323 (citing *Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308, 1319–20 (Ct. Int'l Trade Feb. 2, 2016), *aff'd on other grounds*, 862 F.3d 1337 (Fed. Cir. 2017)). While Pioneer is correct that § 351.401(g) contemplates records that are maintained "in the ordinary course of [the respondent's] business" or according to "normal accounting practices in the country and industry," the regulation also very clearly states that the respondent "must explain why the allocation methodology used does not cause inaccuracies or distortions." Here, Commerce explained that cost information in formats other than the requested CONNUM-specific format resulted in information that "did not reasonably reflect the costs of production of the merchandise." *CIT Op.*, 520 F. Supp. 3d at 1323 (citing *2017–2018 Final IDM* at 34). Commerce was therefore entitled to clarify the regulation regarding the data used in performing margin calculations in the third administrative review because it needed data that "more accurately reflected the costs associated with

the production and sale of the subject merchandise." *Id.* at 1324. We agree with the Court of International Trade that Commerce's pronouncement "reflects a statement of policy rather than the agency's explicit invocation of general legislative authority." *Id.* Accordingly, we see no error in the Court of International Trade's determination that the CONNUM-specific rule is not subject to the notice-and-comment rulemaking provisions of the APA.

B

Pioneer separately asserts that the CONNUM-specific reporting requirement is unlawful because it is inconsistent with the Tariff Act and our decision in *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005). We disagree.

Pioneer contends that 19 U.S.C. § 1677b, concerning the calculation of the normal value of merchandise, "clearly and unambiguously expresses a preference for Commerce to rely on a respondent's GAAP-compliant normal books and records" and "does not contemplate the CONNUM-Specific Rule." Appellants' Br. 33. The relevant portion of § 1677b recites:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and

allowance for capital expenditures and other development costs.

§ 1677b(f)(1)(A).

In *Hynix*, we held that § 1677b(f)(1)(A) permits Commerce to disregard a respondent's GAAP-compliant records upon a finding, supported by substantial evidence, "that the costs do not reasonably reflect the costs of production and should not, therefore, be used." 424 F.3d at 1369. Pioneer claims that Commerce failed to make such a finding here. Specifically, Pioneer takes issue with Commerce's rejection of Pioneer's accounting methods without explaining "why reporting on a CONNUM-specific basis or on a size/weight-specific basis was necessary or why Pioneer's proposed methodology was inadequate." Appellants' Br. 36.

But Commerce did explain its reasoning here. As the Court of International Trade explained, and as we discussed above, Commerce determined in the third administrative review that CONNUM-specific data is essential for the accurate calculation of costs due to the variations in physical characteristics of the merchandise. *CIT Op.*, 520 F. Supp. 3d at 1324–25 (citing *2017–2018 Final IDM* at 34 (describing the product-specific costs as "essential to the accurate calculation of Pioneer's dumping margin")). Commerce "explained that CONNUM-specific reporting yields data more specific to the costs of the subject merchandise than standard GAAP records." *Id.* at 1325. In other words, Commerce found that Pioneer's non-product-specific FOP data did not "reasonably reflect the costs of production and should not, therefore, be used." *Hynix*, 424 F.3d at 1369. On this record, we agree with, and therefore affirm, the Court of International Trade's determination that Commerce's conclusion was based on substantial evidence.

## II

Pioneer also argues that substantial evidence does not support Commerce's decision to apply AFA.  We disagree.

Under 19 U.S.C. § 1677e, Commerce can rely on facts otherwise available when "necessary information is not available on the record" or "an interested party or any other person withholds information that has been requested." § 1677e(a).  After determining that it can rely on FA, Commerce can further apply adverse facts available if a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information."  § 1677e(b).  The "best of its ability" standard requires the respondent to put forth its maximum effort to investigate and obtain full and complete answers to Commerce's inquiries.  *Nippon Steel*, 337 F.3d at 1382.

The Court of International Trade correctly determined that Commerce's application of FA and AFA was supported by substantial evidence.  First, in deciding to apply FA, Commerce reasonably determined that Pioneer's repeated failure to submit its cost information on a CONNUM-specific basis meant that necessary information reasonably reflecting the costs of production was not available.[2]  *CIT Op.*, 520 F. Supp. 3d at 1323–24.

Second, in deciding to apply AFA, Commerce determined that Pioneer "failed to cooperate by not maintaining adequate records and by not developing a methodology to

---

[2]   Although Commerce incorrectly characterizes Pioneer's initial response as one "refusing" to provide the CONNUM-specific data, the error was harmless because Pioneer did not actually provide CONNUM-specific data and also admitted that it would not do so in response to the supplemental questionnaire.  Pioneer stated that it did not have any "cost records that would support any other allocation methodology."  J.A. 1041–44.

report product-specific costs" and thus "failed to act to the best of its ability to comply with a request for information." *2017–2018 Final IDM* at 34. Substantial evidence supports this determination. In particular, as the Court of International Trade explained, "Pioneer failed to even provide more than short, conclusory statements as to why it could not comply with Commerce's requests, much less actually attempt to develop a methodology." *CIT Op.*, 520 F. Supp. 3d at 1327 (citing *2017–2018 Final IDM* at 32). Moreover, Commerce's requests for CONNUM-specific data should not have come as a surprise. Commerce announced during the third administrative review, nearly seven years prior to the underlying tenth administrative review, that it intended to require that "all other future respondents for this case report all FOPs data on a CONNUM-specific basis using all product characteristics in subsequent reviews," explaining that by this stage in the antidumping proceeding, "documentation and data collection requirements should now be fully understood" by all respondents. *2010–2011 Final IDM* at 39. In this announcement, Commerce specifically stated that respondents would have the responsibility to "maintain accounting and production records on a monthly, product-specific basis." *Id.* at 39–40. Commerce even gave an example of how to maintain records: "For instance, in order to calculate product-specific ratios for an input, such as steel wire rod, Hongli and all future respondents should maintain warehouse records, workshop records, etc., on a monthly, product-specific basis for that input." *Id.* at 40 n.132. Notwithstanding its protest that the underlying administrative review "marked the first time Pioneer was selected as a mandatory respondent in an administrative review," Appellants' Br. 7, Pioneer has been on notice of Commerce's reporting requirements as of 2013. Other respondents complied with Commerce's directive and properly provided the requested data. Pioneer provided no reason that it could not have similarly done so. At a minimum, Pioneer should have explained to Commerce why it was

unable to comply and developed and documented an alternative methodology.

On appeal, Pioneer asserts that "[n]ails are a simple product with minor variations," and that "Pioneer reported selling nails with three thicknesses." Appellants' Br. 36. In Pioneer's view, "[t]o suggest that failure to report FOPs on a size/weight-specific basis significantly distorts the margin defies common sense given the minor physical variations of this product." *Id.* at 36–37. But in making this argument Pioneer bolsters the case against it. Although the "best of its ability" standard "does not require perfection," "it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. If a methodology for recordkeeping could have been easily derived, Pioneer cannot argue in good faith that it has acted to the best of its ability. Pioneer "[c]learly . . . possesse[d] knowledge and/or records of the weight, size, and surface area of its products that would have allowed it to develop more accurate FOP allocation methodologies," as Commerce's instructions required, but Pioneer refused to do so. J.A. 1194. Pioneer is responsible for being "familiar with the rules and regulations"; "hav[ing] familiarity with all of the records it maintains in its possession, custody, or control"; and "conduct[ing] prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of [its] ability to do so." *Nippon Steel*, 337 F.3d at 1382. Pioneer's refusal to participate in Commerce's investigation to the best of its ability, despite having the opportunity to do so, supports Commerce's application of AFA. For these reasons, we agree with the Court of International Trade that Commerce's application of AFA was supported by substantial evidence.

Pioneer next argues that even if Commerce's application of AFA was appropriate, "the application of at most *partial* AFA, as opposed to *total* AFA, 'is directed by the statute' in this case." Appellants' Br. 50 (quoting *Nat'l Nail*

18   XI'AN METALS & MINERALS IMPORT & EXPORT CO., LTD. v. US

*Corp. v. United States*, 390 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade June 12, 2019)).  But our court has upheld Commerce's use of total AFA as reasonable when a respondent has failed to cooperate to the best of its ability despite a number of opportunities to do so—specifically in the context of failing to provide CONNUM-specific FOPs. *Mukand Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014).  As we stated in *Mukand*, "[p]roduct-specific information is a fundamental element in the dumping analysis, and it is standard procedure for Commerce to request product-specific data in antidumping investigations." *Id.* at 1307.  Because of the importance of the information requested, Commerce was entirely reasonable to expect "more accurate and responsive answers to the questionnaire." *Id.*  Pioneer did not provide such answers, and therefore we cannot find the application of AFA unsupported by substantial evidence.[3]

---

[3]     Pioneer also asserts that even if we conclude that Commerce properly applied AFA, Commerce failed to explain its selection of 118.04 percent, as opposed to a lower AFA margin.  Appellants' Br. 50–53 (citing our decision in *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1300 (Fed. Cir. 2019)).  We note, however, that Pioneer did not raise this argument before Commerce or the Court of International Trade.  J.A. 1288 (only asserting that "Commerce should be required to explain . . . why a margin of 108.04 [sic] percent is appropriate" in the context of alleging that Commerce should have relied on respondent's books and records).  Pioneer did not identify alternative AFA margins or legal support for the specific argument it now makes.  Pioneer has thus waived this argument because it cannot "raise[] issues for the first time on appeal." *Hylete LLC v. Hybrid Athletics*, LLC, 931 F.3d 1170, 1175 (Fed. Cir. 2019).  To the extent that Pioneer presents this argument

CONCLUSION

We have considered Pioneer's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the Court of International Trade's decision sustaining Commerce's final results.

**AFFIRMED**

---

as it did below to demonstrate that Commerce erred in applying adverse facts available, we are not persuaded for the reasons above.